**ARKOMA BASIN EXPLORATION
COMPANY, INC., et al.,
Petitioners,**

v.

**FMF ASSOCIATES 1990–A, LTD.,
et al., Respondents.**

No. 03–1066.

Supreme Court of Texas.

Argued Dec. 1, 2005.

Decided Jan. 25, 2008.

Rehearing Denied May 2, 2008.

P. Michael Jung, Kenneth S. Beat, Strasburger & Price, L.L.P., David M. Gunn, C. Gregory Shamoun, Howard Jay Klatsky, Shamoun & Klatsky, P.C., Dallas, TX, for Petitioners.

Brian Paul Sanford, Sheils, Winnubst, Sanford & Bethune, P.C., Richardson, Cynthia Hollingsworth, Gardere Wynne Sewell LLP, Dallas, Jeremy C. Martin, Irving, TX, for Respondents.

Jack Crichton, Crichton & Associates, Dallas, Aaron Cawley, Cawley Gillespie & Associates, Fort Worth, Lance Holland, Rockwall, B. Charles Spradlin, Larry T. Long, Kilgore, H.J. Gruy, Houston, Alex Mills, Wichita Falls, TX, for Amicus Curiae.

Justice BRISTER delivered the opinion of the Court in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice GREEN, Justice MEDINA, Justice JOHNSON, and Justice WILLETT joined.

Eight Virginia limited partnerships hired Arkoma Basin Exploration Company[1] to estimate production from mineral properties in the Arkoma Basin in southeastern Oklahoma. When the properties failed to produce as predicted, they sued.

Based on Virginia law, a Texas jury found clear and convincing evidence of fraud and awarded $5.5 million in damages. The trial court signed a judgment reducing the verdict to $4.7 million, and later reduced that further by remittitur to about $2.9 million. When Arkoma appealed the judgment and the partnerships cross-appealed the remittitur, the court of appeals affirmed in all respects but one, holding part of the remittitur improper and restoring about $1.5 million of the jury's verdict.[2]

We granted Arkoma's petition to consider whether there was legally sufficient evidence of fraud under Virginia law, or of damages under Texas law. Finding that only two of the eight limited partnerships met these standards, we affirm the court of appeals' judgment as to FMF Associates 1988–B, Ltd. and FMF Lazare, Ltd., and reverse the remainder.

## I. Evidence of Fraud: Statement of Fact or Opinion?

Arkoma argues that its reserve estimates are immune from any fraud claim under Virginia law. The parties agree that Virginia law governs this issue, and requires clear and convincing evidence to establish liability.[3] As this heightened standard is more substantive than procedural, we apply it in our legal sufficiency review.[4]

1. Petitioners Arkoma Basin Exploration Company, Inc., Arkoma Basin Minerals, Inc., and Mark S. Kelldorf are all referred to as "Arkoma" herein.

2. 118 S.W.3d 445, 463.

3. See Mortarino v. Consultant Eng'g Servs., Inc., 251 Va. 289, 467 S.E.2d 778, 782 (1996); see also Amstutz v. Everett Jones Lumber Corp., 268 Va. 551, 604 S.E.2d 437, 441 (2004) (noting that "clear and convincing evidence is that degree of proof which produces in the

mind of the trier of facts a firm belief or conviction upon the allegations sought to be established. It is intermediate proof, more than a mere preponderance but less than proof beyond a reasonable doubt. It does not mean clear and unequivocal.").

4. See RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 133 (1969) ("The forum will apply its own local law in determining which party has the burden of persuading the trier of fact on a particular issue unless the primary purpose of the relevant rule of the state of the otherwise

The parties agree that reserve estimates do not attempt to calculate the volume of gas underground, but the volume that can be economically produced from a reservoir in the future.[5] As a result, reserve estimates inherently include analysis and assumptions about future events.

■■ Virginia law draws a line between statements of opinion and of fact: "[t]he mere expression of an opinion, however strong and positive the language may be, is no fraud."[6] Additionally, Virginia law distinguishes between statements of existing and future facts: "fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events."[7]

■■ But the line between these categories is not as clear as one might expect from these statements. Virginia specifically eschews a bright-line test, judging each case on its facts, and considering the nature of the representation, the relative knowledge of the parties, their intentions, and all of the surrounding circumstances before deciding whether a statement could constitute fraud:

We have not, however, established a bright line test to ascertain whether false representations constitute matters of opinion or statements of fact. Rather, each case must in a large measure be adjudged upon its own facts, taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances. . . . It is not always an easy matter to determine whether a given statement is one of fact or opinion. The relative knowledge of the parties' dealing, their intentions and all of the surrounding circumstances, which can only be gathered from the evidence, affect the interpretation which the courts put upon the representations in determining whether they be of fact or opinion.[8]

Thus, in some circumstances Virginia law allows fraud claims based on what might otherwise appear to be opinions. For example, the Virginia Supreme Court has held that a consultant who reported "nothing to indicate that wetlands are present," but also warned that this was a matter of opinion, could nevertheless be liable for fraud when 80% of a property

---

applicable law is to affect decision of the issue rather than to regulate the conduct of the trial. In that event, the rule of the state of the otherwise applicable law will be applied.").

5. *See* 17 C.F.R. § 210.4–10(a)(2) ("Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made."); HOWARD R. WILLIAMS & CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS 931 (11th ed.2000).

6. *Lambert v. Downtown Garage, Inc.,* 262 Va. 707, 553 S.E.2d 714, 717 (2001) (quoting

*Saxby v. S. Land Co.,* 109 Va. 196, 63 S.E. 423, 424 (1909)); *Mortarino,* 467 S.E.2d at 781.

7. *Mortarino,* 467 S.E.2d at 781 (quoting *Patrick v. Summers,* 235 Va. 452, 369 S.E.2d 162, 164 (1988)).

8. *Id.* at 781 (internal citations and quotations omitted); *accord, Cohn v. Knowledge Connections, Inc.,* 266 Va. 362, 585 S.E.2d 578, 582 (2003); *McMillion v. Dryvit Sys., Inc.,* 262 Va. 463, 552 S.E.2d 364, 369 (2001); *Yuzefovsky v. St. John's Wood Apartments,* 261 Va. 97, 540 S.E.2d 134, 142 (2001); *Tate v. Colony House Builders, Inc.,* 257 Va. 78, 508 S.E.2d 597, 599 (1999).

was later designated as wetlands.[9] The same court held a fraud claim could be based on a realtor's opinion that there was no termite damage, when in fact he had in hand a report suggesting the opposite.[10] And a builder's opinion that a house was "free from structural defects" could support a fraud claim, but his opinion that "no significant work would be required" could not.[11] In each of these cases, the nature of the statement, the relative knowledge of the parties, and all the surrounding circumstances were taken into account in deciding whether a statement that appeared to be an "opinion" was nevertheless actionable as fraud.

Similarly, statements about future events may constitute fraud under Virginia law in some circumstances. Thus, for example, a sales agent's assurance that the woods behind a condominium would never be cleared constituted fraud when she knew about plans to build a playground there in the future.[12] And the Fourth Circuit has held that a doctor stated a fraud claim under Virginia law by alleging his malpractice insurer falsely assured him that a settlement would not affect his future ability to obtain coverage.[13] Here again, in each case the nature of the statement, the parties' relative knowledge, and all the surrounding circumstances were considered before deciding whether a statement about future events was nevertheless actionable.

Applying these principles to this case, there is no question Arkoma had superior knowledge about likely reserves, as it was hired for precisely that reason. Arkoma represented that its database was "without equal" and "unique" in its ability to combine geologic, engineering, and economic data to assess the potential value of mineral properties.

■ But Arkoma's reserve estimates cannot all be treated alike because their nature and the circumstances surrounding them were very different. The reserves prepared for two partnerships—1988–B and Lazare—concerned mineral interests in the Wilburton field, a mature field where scores of wells had been producing natural gas since 1960. Here, Arkoma estimated production from anticipated "infill" wells drilled between existing wells for which there was a long track record of production. Experts testified that these wells could reasonably be expected to produce from the same strata at similar historical rates, and that reserve estimates in this area could not reasonably vary by more than 10 or 15 percent. Yet there was clear and convincing evidence that Arkoma's estimates assumed that infill wells would last far longer, be much more productive, and yield 200 to 300 percent more than nearby existing wells had ever produced.

■ By contrast, Arkoma's reserve estimates for the remaining six partnerships concerned mineral interests in the South Panola field, a new field in which there had been little drilling or production. Interests here were purchased "ahead of the play"—in areas where minerals had not yet been found, but might be. The plaintiffs' own expert conceded there was less than a year of production history anywhere in this field, and that an entirely

---

9.  *Mortarino,* 467 S.E.2d at 780.

10.  *Horner v. Ahern,* 207 Va. 860, 153 S.E.2d 216, 220 (1967).

11.  *Tate,* 508 S.E.2d at 600–01.

12.  *See Boykin v. Hermitage Realty,* 234 Va. 26, 360 S.E.2d 177, 179 (1987).

13.  *See Merenstein v. St. Paul Fire & Marine Ins. Co.,* 142 FED. APP'x 136, 140 (4th Cir. 2005).

different method of calculating reserves had to be used because no one knew how much wells in this area might eventually produce. Further, while he characterized drilling in the Wilburton field as "low risk," he characterized that in South Panola as "definitely high" risk, which can only mean that reserve estimates in the latter were much more speculative. There was also undisputed evidence that in the decade after Arkoma's estimates, major oil companies had drilled very expensive wells (at $4 million or more each) unsuccessfully looking for the same reserves in the same places that Arkoma had predicted. Viewing all the surrounding circumstances, there was no clear and convincing evidence that Arkoma's estimates in South Panola should be treated as statements of fact rather than of opinion.

Our conclusion that reserve estimates in these two fields must be treated differently is supported by *DeJarnette v. Thomas M. Brooks Lumber Co.*, in which a seller's estimate that standing timber would produce three million board feet of lumber was held to be a statement of opinion rather than fact.[14] The opinion did not suggest that estimates of natural resources must always be one or the other; to the contrary, it turned on specific evidence in that case that the buyer knew the seller's estimate was not based on a detailed survey, and had made his own inspection with an experienced "timber cruiser" before buying. By focusing on how rough or specific the parties thought the defendant's estimate was, Virginia law would appear to require different treatment for estimates in mature and immature gas fields like those here.

We disagree with the dissent that Virginia law exonerates opinions only if they are "good-faith opinions." Because Virginia law requires proof of scienter in every fraud case,[15] honest statements are never actionable whether they are opinions or not. In affirming the fraud verdict as to both fields and all eight partnerships, the court of appeals pointed to evidence suggesting Arkoma's engineer was pressured to inflate some reserve estimates, and may have manipulated some spreadsheet calculations to reach a predetermined result. This is surely some evidence of scienter, but the fact/opinion distinction focuses on reliance. If circumstances show an estimate should be treated as a mere opinion, it is unreasonable to rely on the estimate as a fact whether or not it was a lie.[16]

Accordingly, we reject arguments that Virginia law would uniformly treat all reserve estimates—regardless of the circumstances—as mere opinions (Arkoma's view) or as statements of fact (the partnerships'). Instead, viewing all the surrounding circumstances in a light favorable to the verdict, and keeping in mind Virginia's clear and convincing evidence standard, we hold that Arkoma's reserve estimates in the mature Wilburton field were actionable as statements of fact, while those in the South Panola field were nonactionable statements of opinion. We affirm the jury's fraud verdict as to the 1988–B and

---

14. 199 Va. 18, 97 S.E.2d 750, 758 (1957).

15. *See Yuzefovsky v. St. John's Wood Apartments,* 261 Va. 97, 540 S.E.2d 134, 142 (2001).

16. *See McMillion v. Dryvit Sys., Inc.,* 262 Va. 463, 552 S.E.2d 364, 369 (2001) ("Statements which are vague and indefinite in their nature and terms, or are merely loose, conjectural or exaggerated, go for nothing, though they may not be true, for a [person] is not justified in placing reliance upon them."); *accord, Tate,* 508 S.E.2d at 599; *Mortarino v. Consultant Eng'g Servs., Inc.,* 251 Va. 289, 467 S.E.2d 778, 781 (1996); *Saxby v. S. Land Co.,* 109 Va. 196, 63 S.E. 423, 424 (1909).

Lazare partnerships, and reverse the remainder.

## II. Evidence of Damages: Preservation and Legal Sufficiency

██ Arkoma also challenges the legal sufficiency of the damages evidence. For the reasons stated above, we restrict our review to the two partnerships who proved fraud. They argue Arkoma failed to preserve this error in the trial court because Arkoma's no-evidence objection (1) did not specify why the evidence was legally insufficient, and (2) was not raised before or during trial. As these preservation points concern procedural matters, Texas law governs.[17]

██ To assert a no-evidence complaint in this Court, a party must preserve error in both the trial court and the court of appeals.[18] The court of appeals held that Arkoma's objections in the trial court were not "specific enough to call the trial court's attention to the precise lack of sufficiency asserted on appeal."[19] We disagree, for two reasons.

██ First, Arkoma's post-trial motion explicitly asserted that "there is no evidence ... to support the jury's answers to each part of Question 4," the damages question. Generally, a no-evidence objection directed to a single jury issue is sufficient to preserve error without further detail.[20] Thus, as Justice Calvert wrote for this Court 50 years ago, while a single such objection to all 79 jury answers is too general, the same objection addressed to each individual issue is adequate.[21] Several commentators suggest this is precisely what careful practitioners should do.[22]

██ Second, the cardinal rule for preserving error is that an objection must be clear enough to give the trial court an opportunity to correct it.[23] Here, the trial judge not only had that opportunity, he took it. The trial judge conducted a post-

17. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 778 n. 10, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ("Under traditional choice of law principles, the law of the forum State governs on matters of procedure."); *State of Cal. v. Copus,* 158 Tex. 196, 309 S.W.2d 227, 230 (1958); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 122 (1971) ("A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case."); *see, e.g., In re Lumbermens Mut. Cas. Co.,* 184 S.W.3d 718, 727 (Tex.2006) (applying Texas appellate law in appeal concerning whether Texas or Louisiana substantive law applied to indemnity claim).

18. *See* TEX.R.APP. P. 53.2(f).

19. 118 S.W.3d 445, 457.

20. *See, e.g., Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 648 (Tex.1988); *Owens v. Rogers,* 446 S.W.2d 865, 866 (Tex.1969); *Rosas v. Shafer,* 415 S.W.2d 889, 889–90 (Tex. 1967).

21. *See Biggers v. Cont'l Bus Sys., Inc.,* 157 Tex. 351, 303 S.W.2d 359, 368 (1957).

22. *See, e.g.,* 10 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 140.100[2] (2007); 10 FRANK W. ELLIOTT, WEST'S TEXAS FORMS: CIVIL TRIAL & APPELLATE PRACTICE § 26.1 (3d ed.2000); MICHOL O'CONNOR, O'CONNOR'S TEXAS RULES ⚬ CIVIL TRIALS 630 (Michol O'Connor & Byron P. Davis eds., 2005); 1 STATE BAR OF TEX., TEXAS APPELLATE PRACTICE MANUAL § 6.12 (Roger Townsend et al. eds., 2d ed.1993).

23. *See* TEX.R. CIV. P. 321 (providing that motions for new trial must "briefly refer to that part of the ruling of the court ... to be complained of, in such a way that the objection can be clearly understood by the court"); *Barron v. James,* 145 Tex. 283, 198 S.W.2d 256, 260 (1946) ("The primary purpose of these rules is that the particular point of objection be presented to the court in such way that it may be clearly understood.").

trial hearing on the sufficiency of the damages evidence, received letter briefs on the issue, and wrote a four-page single-spaced letter granting remittitur. Though damages were not reduced as much as Arkoma had hoped, there is no question the trial court was aware of its objection.

■ Of course, stock objections may not always preserve error. If a single jury question involves many issues, it is possible that a general objection may not tell the trial court where to start.[24] But post-trial objections will rarely be as detailed as an appellate brief because time is short, the record may not be ready, and the trial court is already familiar with the case. In that context, an objection is not necessarily inadequate because it does not specify every reason the evidence was insufficient.[25] Like all other procedural rules, those regarding the specificity of post-trial objections should be construed liberally so that the right to appeal is not lost unnecessarily.[26] We hold the court of appeals erred in holding that Arkoma's objection was too general.

■ It is a closer question whether Arkoma had to object to the damages evidence during trial. It was the partnerships' burden to prove damages by expert testimony, as the value of mineral reserves is not a matter of common knowledge.[27] Texas law requires an objection to expert testimony before or during trial if the objection "requires the court to evaluate the underlying methodology, technique, or foundational data," but no objection is required if the complaint "is restricted to the face of the record," as when the complaint is that an opinion was speculative or conclusory on its face,[28] or assumed facts contrary to those on the face of the record.[29] Of course, some objections will fall close to the line between these categories. But we

24. *See* Tex.R. Civ. P. 322 ("Grounds of objections couched in general terms—as that the court erred in its charge, in sustaining or overruling exceptions to the pleadings, and in excluding or admitting evidence, the verdict of the jury is contrary to law, and the like—shall not be considered by the court."); *see, e.g., Campbell v. Texas,* 85 S.W.3d 176, 185 (Tex.2002) (holding inadequate an objection that unidentified statute prohibited trial court from compelling him to do unidentified "things").

25. *See, e.g., Edward D. Jones & Co. v. Fletcher,* 975 S.W.2d 539, 543 (Tex.1998) (holding general no-evidence point preserved objection that defendant had no duty to ascertain client's mental capacity); *Biggers,* 303 S.W.2d at 368; *Clarendon Land, Inv. & Agency Co. v. McClelland,* 86 Tex. 179, 23 S.W. 1100, 1103 (1893) ("Where an assignment of error is sufficiently specific to enable the court to see that a particular ruling is complained of, it should be held good, although it should fail to state the reason why such ruling is claimed to be erroneous.").

26. *See Republic Underwriters Ins. Co. v. Mex-Tex, Inc.,* 150 S.W.3d 423, 427 (Tex.2004);

*Garza v. Garcia,* 137 S.W.3d 36, 38 (Tex.2004); *Cire v. Cummings,* 134 S.W.3d 835, 844 (Tex.2004); *Verburgt v. Dorner,* 959 S.W.2d 615, 616–17 (Tex.1997); *Clarendon Land Inv.,* 23 S.W. at 1103 ("What shall be a sufficiently special assignment of error is not susceptible of precise definition," but "remains to be determined upon the particular circumstances of each case.").

27. *See* Tex.R. Evid. 702; *Kerr–McGee Corp. v. Helton,* 133 S.W.3d 245, 254 (Tex.2004); *Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 567 (Tex.2002).

28. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.,* 136 S.W.3d 227, 233 (Tex.2004).

29. *See Roark v. Allen,* 633 S.W.2d 804, 809 (Tex.1982) (holding opinion that physician should have warned of possible skull fracture was legally insufficient as it assumed physician was aware of fracture when there was no proof he was); *see also City of Keller v. Wilson,* 168 S.W.3d 802, 813 (Tex.2005) ("[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.").

need not categorize Arkoma's objection, because even if no objection was necessary the expert testimony here was legally sufficient.

■ The 1988–B and Lazare partnerships called Michael Harper, a petroleum engineer, to calculate the amount by which reserves were fraudulently inflated. Arkoma does not object to the volumes he estimated for the exaggerated reserves; its sole challenge is that when Harper multiplied those volumes by prices, he failed to discount the total.

Arkoma's argument assumes Harper was using the income approach to value without saying so. In that approach, estimated future income is discounted by a capitalization rate (reflecting both risk and the time value of money) to reach a present value.[30] Arkoma argues that no reasonable jury could credit testimony that a risky return of $100 in the future had a fair value of $100 now.

But Harper never purported to use the income approach. While his testimony about his calculations was cursory, a demonstrative exhibit shows that he believed the price reasonable investors would pay for mineral interests was the total dollars they expected to receive in the next eight years *without* any adjustment for risk, inflation, or interest rates. Although his calculations did not include an explicit discount rate, they included an implicit return for risk and interest because the wells here were expected to produce for substantially more than eight years. While failing to use an explicit discount rate might undermine expert testimony in other cases, we note that "payouts" in the oil and gas business are often calculated in precisely this manner.[31]

■ Arkoma is certainly correct that Harper's testimony could have been a lot clearer; his references to "up here" and "right there" on slides and posters used at trial often make it hard to tell what he is talking about. But we cannot say on this record that his opinions were unreliable or speculative. Nor were they conclusory as a matter of law; Harper did not simply state a conclusion without any explanation,[32] or ask jurors to "take my word for it."[33] It is true that without the foundational data in the appellate record, we cannot confirm that "cash off my runs ... divided by mcf" yielded the $1.62, $1.41, $1.43, and $1.59 prices he calculated as the low range for damages. But experts are not required to introduce such foundational data at trial unless the opposing party

30. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex.2001); *Polk County v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex.1977).

31. *See, e.g., Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 660 (Tex.2005); 8 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL & GAS LAW 769 (2005).

32. *See* BLACK'S LAW DICTIONARY 308 (8th ed.2004) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based."); *see, e.g., Fid. and Guar. Ins. Co. v. Drewery Constr. Co.*, 186 S.W.3d 571, 575 (Tex.2006) (holding affidavits about lost suit papers not conclusory if "supported by some explanation from the person most likely to have seen them"); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex.2002) (finding expert report conclusory as it "simply opines that Barbara might have had 'the possibility of a better outcome' without explaining how Bowie's conduct caused injury"); *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex.1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."); *see also* BLACK'S at 847 ("ipse dixit. [Latin 'he himself said it'] Something asserted but not proved.").

33. *Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex. 1999).

or the court insists.[34]

Accordingly, we reject Arkoma's claim that evidence of the damages suffered by the 1988–B and Lazare partnerships was legally insufficient.

## III. Deadlines for Appeal: From Judgment or Remittitur?

In its original judgment, the trial court reduced the jury's damages verdict for the 1988–B partnership to $2,090,000 and for Lazare to $930,000, a matter they never appealed. But they did challenge by cross-appeal the trial court's remittitur reducing damages further to $1,302,302 for 1988–B and $579,492.76 for Lazare. The court of appeals reversed the remittitur and reinstated the former amounts.[35] Arkoma asserts the court had no jurisdiction to reinstate anything because the partnerships' cross-appeal was two days late.

The trial court's original judgment was signed January 29, 2002. Arkoma's motion for new trial extended the time for appeal to April 29th, 90 days after judgment.[36] When Arkoma filed its notice of appeal on the last possible day, the deadline for a cross-appeal was further extended an additional 14 days to May 13th.[37] The partnerships filed two days later, May 15th.

But the partnerships argue their cross-appeal was timely because the original judgment was modified by remittitur. "If a judgment is modified in any respect," appellate deadlines do not run from the original judgment but "from the date when the modified judgment is signed."[38] According to the partnerships, the trial court's order granting remittitur on April 15, 2002 restarted the appellate timetables, rendering their cross-appeal filed 30 days later timely.[39]

■ Technically, neither trial nor appellate courts can order remittitur; they can only suggest a remittitur on condition that a new trial will be granted if it is refused.[40] We have held that if a court directly orders a reduction in damages, that order necessarily modifies the judgment even if it is incorrectly called a remittitur.[41] By contrast, we have also held that if a party files a purely voluntary remittitur (without any order or suggestion from the court), the judgment has not been modified.[42] If the latter rule were otherwise, a party could extend appellate deadlines indefinitely by remitting a dollar at a time.

We have never addressed whether an order that properly suggests remittitur modifies a judgment "in any respect," and thus restarts appellate deadlines. But we have explained that the deadlines are re-

---

34. *See* Tex.R. Evid. 705(a) ("The expert may testify in terms of opinion or inference and give the expert's reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event disclose on direct examination, or be required to disclose on cross-examination, the underlying facts or data.").

35. 118 S.W.3d 445, 446.

36. *See* Tex.R.App. P. 26.1(a).

37. *See id.* 26.1(d).

38. *Id. 4.3(a); see also* Tex.R. Civ. P. 329b(h).

39. *See* Tex.R.App. P. 26.1.

40. *See id.* 46.1, 46.3; *Snoke v. Republic Underwriters Ins. Co.,* 770 S.W.2d 777, 777 (Tex. 1989) (per curiam); *Flanigan v. Carswell,* 159 Tex. 598, 324 S.W.2d 835, 839 (1959).

41. *See Landmark Am. Ins. Co. v. Pulse Ambulance Serv., Inc.,* 813 S.W.2d 497, 498–99 (Tex.1991) (per curiam).

42. *See Pope v. Wedgeworth,* 221 S.W. 950, 951 (Tex. Comm'n App.1920, holding approved).

started by "*any* change, whether or not material or substantial." [43] Thus, appellate deadlines are restarted by an order that does nothing more than change the docket number or deny all relief not expressly granted.[44]

■ By this standard, we think a signed order suggesting remittitur must restart the appellate deadlines as well. By its very nature, such an order allows only two options: a smaller judgment or a new trial. While it may not be clear when the order is signed which option a claimant will select, it is immediately clear that the original judgment will change. In many cases, the order itself will immediately change which party, if any, should begin preparing for an appeal. Given the relative impacts of an order adding a docket number and an order suggesting remittitur, it would be anomalous if the former restarted appellate deadlines but the latter did not.

It is conceivable, of course, that a judgment might be reinstated after a suggestion of remittitur because the trial judge withdraws the latter. But that does not mean the judgment was not modified "in any respect" in the interim; a trial judge who modifies a judgment and then withdraws the modification has modified the judgment *twice* rather than never.

Because appellate timetables restarted when the trial court signed its remittitur order, the court of appeals had jurisdiction to consider the remittitur. Because Arkoma asserts no other objection to it, it is affirmed.

## IV. Conclusion

For the reasons stated above, we hold that two of the eight limited partnerships presented legally sufficient evidence of

fraud under Virginia law and of damages under Texas law. Accordingly, we affirm the court of appeals' judgment as to FMF Associates 1988–B, Ltd. and FMF Lazare, Ltd. We reverse its judgment and render a take-nothing judgment against FMF Associates 1990–A, Ltd., FMF HMY, Ltd., FMF Kahn, Ltd., FMF Friedman, Ltd., FMF Greenwald, Ltd., and FMF Smallwood, Ltd.

Justice O'NEILL filed a concurring and dissenting opinion.

Justice O'NEILL, concurring and dissenting.

I agree that Arkoma's reserve estimates cannot all be treated alike, as estimates for the relatively unexplored South Panola field were much more speculative. But the mere fact that estimating the South Panola field's reserves was more difficult did not provide Arkoma a license to deliberately falsify data to drive up the mineral rights' acquisition price, of which it received a sizeable percentage, and then cry "opinion" to avoid liability once it pocketed the commission. According to evidence presented at trial, Arkoma did not estimate reserves by working through the necessary data; instead, the desired reserve number was identified, then the calculations were worked backward to determine what the data should be to support that number. While good-faith opinions are shielded from fraud claims under Virginia law, opinions that are deliberately based on information known to be false are not. *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 540 S.E.2d 134, 142 (2001); *Horner v. Ahern*, 207 Va. 860, 153 S.E.2d 216, 220 (1967). I agree with the court of appeals that, even if the repre-

---

**43.** *Check v. Mitchell*, 758 S.W.2d 755, 756 (Tex.1988) (per curiam) (emphasis added).

**44.** *See id.*

sented gas reserves were opinions, they are actionable because those opinions were represented to be based on a particular data-driven process that was not used:

> [Arkoma] told the partnerships they had determined the reserves using a particular process, and the partnerships presented some clear and convincing evidence that [Arkoma] did not use that process but falsified the results through manipulation and falsification of the data and calculations. When estimates and opinions are based on deliberate, intentional falsification of the data and calculations, they are the product of falsified facts and part of the fraudulent misrepresentation. When those estimates are made to a person without the maker's special knowledge of the subject matter, those estimates, if intentionally misrepresenting the facts, are actionable.

118 S.W.3d 445, 455 (citing *Horner*, 153 S.E.2d at 220–21).

According to the evidence presented at trial, Arkoma held itself out as having special expertise in the Arkoma Basin by its possession of a unique database that allowed it to more accurately estimate reserves and potential cash flows. FMF relied on Arkoma's purported expertise in acquiring the mineral rights that it marketed to investors, and paid a premium for those rights that directly benefited Arkoma. Under these circumstances, I disagree with the Court's conclusion that Arkoma is exempt from liability for misrepresentations concerning the South Panola field, and to this extent I respectfully dissent. I join the remainder of the Court's opinion.