Opinion issued March 16, 2017



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-14-00179-CV

_____

### VICTOR KAREH, M.D., Appellant

### V.

### TRACY WINDRUM, INDIVIDUALLY, AS REPRESENTATIVE OF THE ESTATE OF LANCER WINDRUM, AND ON BEHALF OF HER MINOR CHILDREN, B.W., J.W., AND H.W., Appellee

---

On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Case No. 2012-07156

---

### OPINION DISSENTING FROM DENIAL OF EN BANC RECONSIDERATION

The panel errs in holding that the evidence is legally insufficient to support

the jury's finding that the negligence of appellant, Victor Kareh, M.D., caused the

death of Lancer Windrum ("Lance"); reversing the judgment of the trial court in favor of Lance's wife, appellee, Tracy Windrum, individually, as representative of Lance's estate, and on behalf of their minor children, B.W., J.W., and H.W.; and rendering judgment in favor of Kareh.

In doing so, the panel erroneously concludes that Windrum presented "no evidence" of the standard of care or of a breach by Dr. Kareh toward his patient, Lance, beyond the "conclusory testimony" of Windrum's expert, Dr. Robert Parrish. The panel further erroneously concludes that, as a matter of law, Kareh's decision not to recommend the placement of a shunt to maintain the flow of cerebrospinal fluid through Lance's brain was "too remote" to have been the proximate cause of Lance's subsequent death because Lance could have survived if he had somehow "had a shunt done the day before he died."

Because the panel substitutes its judgment for that of the jury on credibility issues and disregards substantial evidence and well-settled legal-sufficiency principles, I respectfully dissent from this Court's denial of en banc reconsideration of this case. *See* TEX. R. APP. P. 41.2(c).

## Legal-Sufficiency Standard and Principles

We are to sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only

evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a court must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. The term "inference" means,

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner,* 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (quoting *Inference*, BLACK'S LAW DICTIONARY (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex. 2004). If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998). However, "when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal

effect, is no evidence. *Ford Motor Co.,* 135 S.W.3d at 601 (internal quotations omitted).

To raise a genuine issue of material fact, "the evidence must transcend mere suspicion." *Id.* Evidence that "is so slight as to make any inference a guess is in legal effect no evidence." *Id.* If the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *City of Keller,* 168 S.W.3d at 822. However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the fact-finder must be allowed to do so. *Id.* A reviewing court cannot substitute its judgment for that of the fact-finder, so long as the evidence falls within this zone of reasonable disagreement. *Id.*

"It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (quoting *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 380 (Tex. 1956)). Opinion testimony that is conclusory or speculative does not tend to make the existence of a material fact "more probable or less probable," and it is neither relevant nor competent. *Id.* (quoting TEX. R. EVID. 401). "[I]t is the basis of the witness's opinion, and not the witness's qualifications or his bare opinions alone, that can settle an issue as a matter of law; a claim will not stand or fall on the mere ipse dixit of a credentialed

4

witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999); *see also Ipse dixit*, BLACK'S LAW DICTIONARY (8th ed. 2004) ("ipse dixit [Latin 'he himself said it'] Something asserted but not proved" (alteration in original)).

An expert's opinion is conclusory "if *no basis* for the opinion is offered, or the basis offered provides *no support*" for the opinion. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) (emphasis added); *see also Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008) (expert's opinion is conclusory if he "simply state[s] a conclusion without any explanation" or asks jurors to just "take [his] word for it") (citing *Conclusory*, BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based")). Opinion testimony that amounts to "mere conjecture, guess, or speculation" is not sufficient. *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798–99 (Tex. 2004); *Price v. Divita*, 224 S.W.3d 331, 337 (Tex. App.— Houston [1st Dist.] 2006, pet. denied). The expert "must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). He "must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury." *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010).

In evaluating whether an expert's testimony is legally sufficient, we "cannot consider only [the] expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis." *City of Keller*, 168 S.W.3d at 813; *see also Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 910–11 (Tex. 2004) (in evaluating whether expert's testimony is speculative or conclusory, we review entire record, not just expert's statements in isolation). "[I]f an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded." *City of Keller*, 168 S.W.3d at 813. However, merely because an expert's testimony "could have been a lot clearer" does not render it speculative or conclusory as a matter of law. *Arkoma Basin Explor. Co., Inc.*, 249 S.W.3d at 389.

### The Evidence

The first major erroneous conclusion of the panel is that Windrum "presented no evidence concerning the standard of care and Dr. Kareh's breach of the standard of care beyond Dr. Parrish's conclusory testimony." The record shows that Parrish specifically testified that the applicable standard of care required that Kareh:

> [Make] the right diagnosis[:] . . . Symptomatic obstructive hydrocephalus. Number two, . . . recommend[] a shunt or some definitive procedure to treat the hydrocephalus. And, three, . . . properly inform[] the patient and the patient's family . . . [of] the reasonable things that would happen if he got a

shunt. But even more importantly or as important . . . the benefit of getting the shunt and the risk of not getting a shunt.

And the record reveals that Parrish detailed the factual basis of his opinion and explained how and why the standard of care required Kareh to recommend the placement of a shunt. *See Jelinek*, 328 S.W.3d at 536; *Pollock*, 284 S.W.3d at 818.

Dr. Parrish first presented to the jury a foundational description of the anatomy and physiology of the human brain. He explained that cerebrospinal fluid is produced in the "ventricles," or brain cavities. And located within the brain stem, at the base of the skull, is the "aqueduct." The body requires a "continuous flow of [cerebrospinal] fluid" from the ventricles, through the aqueduct, around the brain and spinal cord, into the vena system, and back to the heart. The brain actually floats in the cerebrospinal fluid, which is "crystal clear," "acts as a buffer," contains nutrients, and carries away all the waste products from the brain. Nuclei and nerves in the brain stem regulate the autonomic functions in the body, such as heart rate and breathing. Parrish explained that "[a]ll of these centers are connected," and "[i]f you mess them up just a little bit, . . . things can go very wrong." For instance, Parrish noted that a portion of the aqueduct governs wakefulness, and "[i]f a tiny little perforator goes awry, the patient never wakes up." Further, "[c]ompression on the midbrain can . . . cause someone to stop breathing." And a complete obstruction of the aqueduct and interruption of the flow of cerebrospinal fluid can cause death within fifteen minutes.

7

Dr. Parrish further testified that Lance's medical records show that when he arrived at the hospital on February 3, 2010, he was confused, had slurred speech, and had fallen. Hours later, Lance's symptoms began to subside. He was more alert, less confused, and his speech was clearer. Parrish noted that the significance of Lance's apparent return toward normal was that,

> whatever happened happened, and it's now gone. In other words, it's not like he had a stroke and he's continuing to get worse and worse and worse or he's got an expanding brain tumor that's getting bigger and bigger and he's getting worse and worse. He's got something that happened. It happened for awhile, and then it sort of seems like it fixed itself.

Lance's medical history included that he had, three times in the preceding months, experienced similar "intermittent" episodes of staggering, slurred speech, headaches, and altered mental status, which Parrish identified as "classic symptoms of increased intracranial pressure." And Lance's symptoms were "progressive" in that the first two were episodes were fairly mild, then the third, which occurred on December 24, 2009, was "pretty bad."

A magnetic resonance image ("MRI") taken of Lance's brain on February 3, 2010 confirmed that he had "obstructive hydrocephalus"[1] and "clinical evidence of intracranial pressure." Dr. Parrish specifically noted that the image, which was displayed to the jury, showed that Lance's aqueduct, which was "supposed to be

---

[1] Dr. Maria Cristin Payan testified that "hydrocephalus" is an excess production of cerebrospinal fluid, a lack of reabsorption of cerebrospinal fluid, or a dysfunction in the passage of cerebrospinal fluid.

8

fairly uniform size all the way through," was not. Rather, the "top part of the aqueduct [was] enlarged compared to the bottom part, which [was] extremely small," "very tight," and "almost nonexistent." Parrish identified Lance's condition as "aqueductal stenosis,"[2] and he explained that because aqueductal stenosis obstructs the flow of spinal fluid, the ventricles compensate for the pressure caused by the obstruction by becoming "bigger and bigger." Parrish showed the jury how, on the image, it was "easy to see . . . pressure like you're blowing up a balloon" and that Lance had a "huge" third ventricle, which evidenced increased cranial pressure.

Dr. Parrish further explained that, importantly, something was "missing" from Lance's MRI, namely, "transependymal edema," which is seen very commonly in "normal pressure or communicating hydrocephalus." It occurs when "there is a long-term pressure, a lower but a long-term pressure which drives fluid into the ventricular walls." Parrish noted that "[o]ne doesn't see that in acute hydrocephalus and acute pressure changes." Thus, "what we're seeing here is acute pressure makes them bigger, makes them bigger, then it relaxes the pressure. Makes them bigger, makes them bigger until it gets to where they can't get any bigger, and then you [have] got a real problem."

---

[2] Dr. Randolph Evans testified that "aqueductal stenosis" is one form of obstructive hydrocephalus.

Moreover, although Lance, while in the hospital, seemed to "g[e]t better really fast," Dr. Parrish noted that he was demonstrating "typical compensated hydrocephalus." When the aqueduct is smaller than it is supposed to be, or stenotic, it is "partially obstructed." It is more difficult for cerebrospinal fluid to flow through the aqueduct, and it takes higher pressure to force the fluid through. Lance was experiencing periods of neurological symptoms, i.e., slurring his speech and staggering, that were consistent with "acute" "very high pressure spikes." Once the pressure built to such a point that the cerebrospinal fluid finally "pushe[d] through," the symptoms resolved. Parrish explained that a person "can compensate up to a point, and at some point the time bomb goes off." And Lance's progressive symptoms demonstrated that he was "at the end of his compensation."

Dr. Parrish clarified that, based on his own experience as a neurosurgeon treating patients with "brain stem compression from acute hydrocephalus," the pairing of the "classic symptoms" with MRI results such as Lance's "equals a shunt" "[e]very time." He had "no doubt" that the standard of care required the placement of a shunt. Although Lance's symptoms might be generic if taken in isolation, Parrish noted that his symptoms were "progressive," and, "in the face of that [MRI] scan showing severe aqueductal stenosis, they are the light bulb that needs to go off and say this requires a shunt." Although such surgery always poses risks, Lance was "more likely to die of aqueduct obstruction."

10

Dr. Parrish further testified that, based on the above, Dr. Kareh breached the standard of care by: (1) failing to properly diagnose Lance's condition as "[s]ymptomatic obstructive hydrocephalus" and instead misdiagnosing Lance as having "[n]o hydrocephalus," (2) discharging him without "recommending a shunt or some definitive procedure to treat the hydrocephalus," and (3) discharging him without "properly informing" Lance and his family of "the benefit of getting the shunt and the risk of not getting a shunt."

The panel, without citation to authority, first argues that Dr. Parrish's testimony constitutes "no evidence," in part, because he "presented no medical literature to support his opinion that the standard of care required the placement of a shunt 'every time' when Dr. Kareh saw Lance in early February 2010." Again, however, Parrish specifically testified based on his experience as a neurosurgeon treating patients with "brain stem compression from acute hydrocephalus." "Experience alone may provide a sufficient basis for an expert's testimony." *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998). Moreover, the record shows that Parrish did testify that he relied on the following peer-reviewed medical literature: "Dynamic Axial Brain Stem Distortion as a Mechanism Explaining the Cardiorespiratory Changes in Increased Cranial Pressure," by R.K. Thompson and S. Malina, published by the Journal of Neurosurgery; "Sudden Unexpected Death in Young Adults with Chronic

11

Hydrocephalus," by C.H. Rickert, published by the International Journal of Legal Medicine; and "Sudden Unexplained Death in Adults Caused by Intracranial Pressure," by D.I. Graham and M. Black, published by the Journal of Clinical Pathology.

The panel also asserts that "[o]ther testimony by Dr. Parrish . . . undermined his claim that it was professional negligence, or malpractice, for Dr. Kareh not to install a shunt in Lance's brain on February 4, 2010." The panel states that Parrish "agreed that Lance had increased intracranial pressure 'at some point' in his life and that it was possible that his ventricles had enlarged and then remained the same size ever since he had had encephalitis as a child." A careful reading of the testimony shows, however, that Parrish explained that even if Lance had enlarged or enlarging ventricles over a period of many years, *what was significant was that he had become symptomatic*. The panel also points out that Parrish agreed that Lance did not have some of the symptoms of increased intracranial pressure, such as papilledema, or swelling behind the eyes. Parrish explained, however, that such absence was not significant because "it can mean there's scar tissue around the optic nerve, which could very well have been the case with [Lance], such that the pressure can't get back to the back of the eyes." And, "in a case like this where, . . . clinically, the pressure is coming and going," it is "normal and then it's so high it's going to kill him, you will not expect to see papilledema all the time."

12

The panel further concludes that contrary testimony established that Dr. Parrish's testimony constituted "no evidence." *See City of Keller*, 168 S.W.3d at 813 (in evaluating expert's testimony, court "cannot consider only [the] expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis"); *Ramirez*, 159 S.W.3d at 910. Specifically, "Dr. Kareh presented evidence that shunt placement was not appropriate in this case due to the monitoring results, which indicated that Lance was not suffering from increased intracranial pressure at the time Dr. Kareh was consulting on his case." Dr. Harpaul Gill, Lance's treating neurologist, "agreed with the decision to discharge Lance without surgical intervention because Lance did not demonstrate a sustained increase in intracranial pressure, his headaches had improved, and he 'was feeling better.'" And "[n]either Dr. Gill nor Dr. [Randolph] Evans testified concerning the specific risks of placing a shunt when the patient does not have increased intracranial pressure."

However, Dr. Kareh's testimony, which was inherently contradictory and often supported that of Dr. Parrish, neither established that Lance "was not suffering from increased intracranial pressure" nor rendered Parrish's testimony insufficient. Kareh testified that although he had concluded in his written reports at the hospital that Lance had "no hydrocephalus," he agreed that Lance had "hydrocephalus" and "aqueductal stenosis," and he had meant to write that Lance had "no increased intracranial pressure." Kareh stated that the result of the

13

intracranial pressure monitoring test that he performed on Lance was "normal" and he saw "no increased pressure." However, during the test, Lance had at least six "spikes" of increased cranial pressure above, what Kareh considered to be, the normal limit of 14.28 millimeters of mercury. During one such spike, Lance experienced a pressure of 33 millimeters of pressure. Kareh spoke with a nurse about this, but he could not recall which nurse or what the nurse told him. Kareh also explained that he never accessed Lance's actual intracranial pressure test results, although they were available on the computers at the hospital and at his office and home. He was not aware of the other elevated readings. Rather, he had relied on a nurse's log, which required the nurse to convert the computerized results, given in millimeters of mercury, to handwritten computations in centimeters of water. And Kareh "didn't talk to anybody" before he "made the decision" to discharge Lance.

Dr. Kareh did not recommend the placement of a shunt because the increase in Lance's intracranial pressure was not "sustained." He explained that "[s]ustained increased intracranial pressure means that the pressure inside the head will be kept above the normal level for a considerable amount of time, 30 minutes, 15 minutes. . . . And the higher the pressure, the less time that the brain will allow." And "[t]otal obstructive hydrocephalus is not compatible with life." In other words, a patient with "sustained" pressure would die within minutes.

Dr. Kareh noted that Lance "didn't have the signs of normal pressure hydrocephalus." He also agreed that a patient with compensated obstructive hydrocephalus can lose his ability to compensate. Kareh admitted that when he arrived at the hospital to examine Lance, he did not look at the medical notes regarding Lance's history and was unaware that this was the fourth event that Lance had experienced in less than six months. Kareh agreed that Lance's symptoms, i.e., slurred speech, confusion, being off-balance, tremors in his hand and leg, and headaches, all of which resolved over several hours or by the following day, were consistent with obstructive hydrocephalus and increased pressure. And Kareh further agreed that "[a]s long as there is increased intracranial pressure, . . . a shunt is the solution." Dr. Warren Neely, Kareh's own expert, also testified that the applicable standard of care and the treatment for obstructive hydrocephalus is "either a shunt or a third ventriculostomy."

Dr. Gill, a board certified neurologist and expert in the diagnosis of hydrocephalus, also testified that the applicable standard of care for the treatment of obstructive hydrocephalus is either the placement of a shunt or a third ventriculostomy. It was "always clear" to him that Lance was suffering from obstructive hydrocephalus, and his opinion never changed. Gill was glad to have a neurosurgeon involved because the only issue left was "what to do about it." He opined, based on his experience, that it is not abnormal for a patient with

15

obstructive hydrocephalus to have intermittent or transient periods of elevated intracranial pressure. One moment the patient may have elevated pressure and the next moment it may alleviate itself. During episodes of increased pressure, the patient can feel off-balance and confused, and have headaches and slurred speech. And the real concern is that a moment may come in which that pressure does not alleviate itself. Gill explained that because obstructive hydrocephalus can lead to an increase in cranial pressure that can cause severe brain damage or death within fifteen minutes, the applicable standard of care is to compensate for the obstruction by either installing a shunt or performing a third ventriculostomy. He noted that he had written in his February 4, 2010 consultation report regarding Lance that he had spoken with Dr. Kareh about a possible shunt placement to occur the very next morning.

Dr. Gill further explained that because intracranial pressure fluctuates, whether a patient exhibits elevated pressure on any given day depends on his particular status at that time. He agreed that "you can't rely upon the absence of pressure on an intracranial pressure monitoring test," such as that performed by Dr. Kareh, to determine the course of treatment. And Gill noted that he was "okay" with Lance's discharge because it was "okay with the neurosurgeon," Kareh, who, as the neurosurgeon, had the responsibility to make the decision.

Although Dr. Gill did note that on February 5, 2010, Lance seemed to be "feeling better" and his "headaches were improving," Dr. Parrish, as discussed above, explained in detail the intermittent nature of Lance's condition. And, as the panel notes, Gill "agreed that intracranial pressure fluctuates and that increased pressure could be intermittent." Notably, Gill further testified that he could not recall having ever been involved in the care or treatment of any patient with acute or obstructive hydrocephalus who was not treated with a shunt or a third ventriculostomy, or who was treated effectively without a shunt or third ventriculostomy.

Dr. Evans, a neurologist expert originally retained by Dr. Gill, agreed that "every physician" who treated Lance in the emergency room "agreed with the diagnosis that he had obstructive hydrocephalus." He testified that Lance had aqueductal stenosis, which is a particular type of obstructive hydrocephalus, and he agreed that the symptoms can be transient, a diagnosis could be made with an MRI, and an intracranial pressure monitoring test, such as that performed by Dr. Kareh, was not required. Evans agreed that there are two major alternatives for treating aqueductal stenosis: shunt surgery and third ventriculostomy. And he agreed that for most patients, unless they have a "specific physical impairment like age or a heart condition," "surgical intervention is going to be the appropriate thing to do." Evans noted that shunt surgery, although not without risks, is successful in

17

over eighty percent of cases, and post-operative mortality is "close to zero." And, from his review of the medical records, it was apparent that Gill had not simply agreed to discharge Lance without a shunt or third ventriculostomy. Rather, Gill had, as is customary, simply deferred to the decision of the neurosurgeon, Kareh.

The second major erroneous conclusion of the panel is that "even if Dr. Kareh's actions did fall below the standard of care, Windrum failed to establish that Dr. Kareh's actions proximately caused Lance's death." However, Windrum presented ample evidence that Kareh's negligence did proximately cause Lance's death.

Dr. Parrish opined that Dr. Kareh's breach of the standard of care, i.e., his failure to "put a shunt in when he saw [Lance] in the hospital," caused Lance to "die[] of obstructive hydrocephalus." And, as discussed above, he provided a detailed explanation of the facts supporting his opinion. Parrish characterized Lance's condition as that of him having a "ticking time bomb" inside of his head. Once Lance's "aqueduct obstructed," there was "pressure in the ventricles," which "put pressure on the red nuclei and the periaqueductal region right around where all that important stuff is. And those fibers made him stop breathing and his heart stop beating. . . . All those vital structures stopped." Parrish further explained that, based on his review, there were no other causes that provide a reasonable explanation for Lance's death.

The panel argues that Dr. Parrish's testimony constitutes "no evidence" of causation, in part, because he had "agreed that there was no 'microscopic evidence' of increased cranial pressure at the time of Lance's autopsy." However, the record reveals that he so agreed based only "on what [he] could find and see on the autopsy information that was provided to [him] by [Windrum] at the time of [his] deposition." In fact, Parrish explained that based on his subsequent review of the affidavit of Windrum's forensic pathologist and neuropathologist expert, Dr. Ljubisa Dragovic, the microscopic slides from the autopsy reveal a hemorrhage in the aqueduct that "absolutely slam dunk confirm[ed]" that "there was pressure on the top of the brain stem that caused Lance . . . to die." He noted that the slides show a "deformation of the top of the brain stem, which confirms [his] belief" that Lance "died from compression axial loading on the top of the brain stem." And Parrish explained that compression axial loading on the top of the brain stem constitutes evidence of increased cranial pressure.

Further, Dr. Dragovic, from his review of Lance's history, the clinical imaging, and the materials from the Harris County Medical Examiner's Office, opined, based on a reasonable degree of medical probability, that Lance "died as a result of complications of obstructive hydrocephalus." He explained that the "critical finding" in the autopsy report was of "impaired flow of cerebral spinal fluid through the aqueduct." Dragovic noted that the "aqueduct was abnormal and

19

was described as being . . . pinpoint to not identifiable." And Lance's enlarged ventricles "reflect[ed] sudden increase of [intracranial] pressure as a result of increased blockage." Based on his review of the microscopic slides, Dragovic had "[n]o doubt whatsoever" that Lance died from an "acute complete obstruction of the aqueduct." He saw nothing in Lance's records that was inconsistent, and he explained in detail how he excluded a heart condition or event as the cause of Lance's death.

The panel also argues that Dr. Parrish's testimony constitutes "no evidence" of causation because he had "agreed with defense counsel that the April MRI revealed that Lance's symptoms were progressing and that Lance could have survived 'if he'd had a shunt done the day before he died,' indicating that any failure by Dr. Kareh to place a shunt when he saw Lance in February 2010 was not an *immediate* cause of death." (Emphasis added.) And it holds, "as a matter of law, Dr. Kareh's decision not to recommend placement of a shunt on February 4, 2010, was too remote from Lance's death on May 2, 2010, to constitute a proximate cause of Lance's death."

"Proximate cause does not necessarily mean the last cause, or the act immediately preceding an injury." *Rodriguez v. Moerbe*, 963 S.W.2d 808, 819 (Tex. App.—San Antonio 1998, pet. denied). Proximate cause requires proof of (1) foreseeability and (2) cause-in-fact. *Morrell v. Finke*, 184 S.W.3d 257, 271

20

(Tex. App.—Fort Worth 2005, pet. denied). "[T]he ultimate standard of proof on cause-in-fact is whether by a preponderance of the evidence, the negligent act or omission is shown to be a *substantial factor* in bringing about an injury, without which the harm would not have occurred." *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995) (emphasis added). And "[m]ore than one act may be the proximate cause of the same injury." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001); *see, e.g.*, *Harvey v. Stanley*, 803 S.W.2d 721, 725–26 (Tex. App.—Fort Worth 1990, writ denied) (holding first doctor liable for failure to diagnose heart condition where patient died during subsequent stress test conducted under supervision of second doctor).

Dr. Kareh testified that he was the only neurosurgeon involved in Lance's case and the only doctor in charge of making a decision as to whether Lance needed a shunt. The evidence that Lance's symptoms continued and his clinical condition worsened after Kareh discharged him without a shunt supports Dr. Parrish's testimony that Lance's obstructive hydrocephalus was progressive, he was losing his ability to compensate, death from an obstructed aqueduct was foreseeable, and Kareh's decision to discharge him without a shunt constituted a substantial factor in bringing about his death. And there is no evidence in the record of any new or independent cause occurring between Lance's discharge from the hospital and his death.

21

Moreover, the rule is "well settled that the question of proximate causation is one of fact peculiarly within the province of the jury, and the jury finding on it will be set aside only in the most exceptional cases." *Enloe v. Barfield*, 422 S.W.2d 905, 908 (Tex. 1967); *Tex. Dep't of Transp. v. Olson*, 980 S.W.2d 890, 893 (Tex. App.—Houston [1st Dist.] 1998, no pet.). The panel does not identify any such exceptional circumstance presented in this case.

## Conclusion

In sum, Windrum presented ample evidence of the standard of care, breach, and proximate causation to support the jury's liability finding against Dr. Kareh. Dr. Parrish's testimony is not speculative or conclusory because he did not "simply state a conclusion without any explanation" or ask jurors to simply "take [his] word for it." *See Arkoma Basin Explor. Co., Inc.*, 249 S.W.3d at 390. Rather, his testimony is grounded in the facts recorded in Lance's medical records and lab results. And Parrish specifically provided the underlying factual bases for his opinions. *See Pollock*, 284 S.W.3d at 818 (expert's opinion conclusory "if *no basis* for the opinion is offered, or the basis offered provides *no support*" for opinion) (emphasis added)). Further, he explained how and why the negligence caused the injury. *See Jelinek*, 328 S.W.3d at 536. "In a battle of competing experts," as here, it is the "sole obligation of the jury to determine the credibility of the witnesses and to weigh their testimony." *Morrell*, 184 S.W.3d at 282; *see also*

22

*City of Keller*, 168 S.W.3d at 819. It is particularly within the province of the jury to "weigh opinion evidence and the judgment of experts." *Morrell*, 184 S.W.3d at 282. And it is the jury who "decides which expert witness to credit." *Id.* "Reviewing courts cannot impose their own opinions to the contrary." *City of Keller*, 168 S.W.3d at 819.

The panel, in overturning the jury's verdict and the trial court's judgment, weighs evidence, credits certain evidence that the jury was free to disregard, and disregards substantial evidence that supports the jury's findings. In doing so, the panel misapplies Texas's well-settled legal-sufficiency standard and principles and substitutes its opinion for that of the jury on credibility issues. Accordingly, the panel's errors should be corrected by this Court or by our high court. *See* TEX. R. APP. P. 41.2(c) ("[E]xtraordinary circumstances require en banc consideration."); TEX. GOV'T CODE ANN. § 22.001(a)(6) (Vernon 2004) ("The supreme court has appellate jurisdiction [when] . . . an error of law has been committed by the court of appeals, and that error is of such importance to the jurisprudence of the state that . . . it requires correction . . . .").

Terry Jennings
Justice

Panel consists of Justices Keyes, Massengale, and Bland.

Jennings, J., dissenting from the denial of en banc reconsideration with separate opinion, joined by Justices Higley and Lloyd.