AFFIRM; Opinion Filed March 8, 2013.



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

No. 05-10-00342-CV

AMERICAN EUROCOPTER CORPORATION, Appellant

V.

CJ SYSTEMS AVIATION GROUP, Appellee

On Appeal from the 298th District Court
Dallas County, Texas
Trial Court Cause No. 02-03974-M

# OPINION ON MOTION FOR REHEARING

Before Justices Murphy, Fillmore, and Myers
Opinion By Justice Myers

We withdraw this Court's opinion of July 18, 2012 and vacate the judgment of that date; the following is now the opinion in this case.

On October 16, 2000, a Eurocopter AS 355 F2 Twinstar helicopter owned by Duke University Medical Center in North Carolina and operated by CJ Systems Aviation Group (CJ), crashed when the main rotor gearbox failed. American Eurocopter Corporation (American) had overhauled the gearbox and provided it to CJ. Eurocopter, a French company, manufactured the helicopter. The family of the deceased pilot sued American, which paid the family $2,250,000 in settlement of the claims. Duke's insurer sued American in an unsuccessful attempt to recover the

amount it paid Duke for the helicopter. American then sued CJ for contractual indemnity to recover the amount of the settlement with the pilot's family and for American's attorney's fees in the different lawsuits. CJ counterclaimed for breach of warranty on the failed gearbox. Following a jury trial, the trial court rendered a take-nothing judgment on American's claims against CJ and awarded CJ $78,935.62 on its counterclaim.

American brings six issues on appeal contending (a) the evidence is legally and factually insufficient to support a finding that American's negligence, if any, was a proximate cause of the crash; (b) the trial court erred by denying American judgment for contractual indemnity and attorney's fees in the amounts found by the jury; (c) the jury's answer concerning whether CJ's negligence was the sole legal cause of the crash was immaterial; and (d) there was no evidence of an express warranty for which CJ could be awarded money damages. We affirm the trial court's judgment.

## BACKGROUND[1]

Before the crash, CJ ordered an overhauled main rotor gearbox from American's facility in Grand Prairie, Texas. The gearbox arrived with the appropriate documentation certifying it as airworthy. On October 12, 2000, four days before the accident, CJ's mechanics installed the gearbox on the helicopter and tested it. The overhauled gearbox passed its tests and test flights without any problems and without any warning lights illuminating. This overhauled gearbox should have been good for 3000 hours of flying.

### The Crash

On the night of October 16, when the gearbox had only about three and one-half hours of use,

---

[1] Many of the facts related below were disputed in the trial court. This factual summary presents the evidence in the light most favorable to the jury's decision.

the helicopter was needed to transfer a patient from Alamance Medical Center to Duke. The pilot, John Holland, and two nurses took off from Duke in the helicopter. During the flight, the oil-pressure warning light for the gearbox illuminated, but the oil-temperature warning light did not illuminate. Holland landed the helicopter safely at Alamance hospital, shut down the engines, and took the helicopter out of service. The nurses left the helicopter and arranged for the patient and themselves to be taken to Duke by ground ambulance.

Holland called CJ's mechanic on duty that night, Charles Edgerton, who arrived at Alamance with some tools but no maintenance manuals or spare parts. Edgerton checked for oil leaks, did not find any evidence of an oil leak, and did not smell any burnt oil. Edgerton turned on the battery switch, starting the electrical power but leaving the engines turned off. The oil-pressure warning light illuminated, but this was appropriate because, with the engines off, no oil pressure was generated. Edgerton then disconnected the oil-pressure switch, and the warning light turned off, which indicated the light was connected to the oil-pressure switch and was not being illuminated by a short circuit. Edgerton knew that when only the gearbox oil-pressure warning light illuminated, the problem was usually a faulty oil-pressure switch, which would be replaced. Edgerton did not have the tools and parts with him to change the switch. He rotated the main rotor and did not feel any unusual vibrations or hear any unusual sounds. Edgerton and Holland decided that because the gearbox was newly overhauled and had minimal use, the problem was a faulty oil-pressure switch. They decided that Holland would run the engines for a few minutes on the ground and then hover just off the ground. If no other warning lights illuminated, and if Holland felt comfortable flying the helicopter, Holland would fly the helicopter back to Duke for further maintenance. Holland asked Edgerton to leave the oil-pressure warning light disconnected so he would not be distracted from observing the oil-temperature warning light if it came on. Holland ran the helicopter on the ground,

hovered for a few minutes, and then flew away. About one minute into the flight, the main rotor gearbox suffered a catastrophic failure. The helicopter crashed, and Holland was killed. Accident investigators testified that the crash was caused by the lack of cooling lubrication on the gears of the main rotor gearbox.

## The Gearbox

Unbeknownst to Edgerton and Holland, the newly overhauled gearbox from American had not properly passed its tests before being certified as airworthy. Under the procedures mandated by Eurocopter's overhaul manuals, before an overhauled main rotor gearbox may be certified for service, it must pass a rotation bench test in which it is brought up to a particular speed and run for ten to thirty minutes while monitoring the oil temperature and pressure. The first three times the gearbox was tested,[2] the oil temperature exceeded the maximum permitted before the ten-minute test period expired. On the fourth test, the temperature reached, but did not exceed, the maximum permitted temperature at the ten-minute mark. However, at the ten-minute mark, the oil pressure dropped below the minimum permitted by Eurocopter's overhaul manuals.[3] Despite never obtaining acceptable results on the bench test, American certified the gearbox as airworthy and transferred it to CJ.

## The Indemnity Agreement

CJ signed a Service Center Agreement with American, which authorized CJ to maintain and repair Eurocopter Helicopters for certain owners, including Duke. The agreement contained a

---

[2] There is evidence showing American's retesting of the gearbox violated Eurocopter's overhaul manuals. Doug Stimpson, CJ's expert witness for maintenance and overhauling, testified that Eurocopter's overhaul manuals required products that did not pass approval tests to follow different procedures and not simply be retested.

[3] Eurocopter's overhaul manuals required the oil pressure be no less than 3 bars, which is 43.5 psi. On the fourth test, the oil pressure after ten minutes was 41 psi, which is 2.8 bars and below the required 3 bars of pressure.

provision in which CJ agreed to indemnify American against all losses, claims, and expenses including legal expenses with respect to defective work "arising from services furnished and work performed" by CJ.

## The Litigation

Duke's insurer sued American in North Carolina for the loss of the helicopter, and American received a verdict in its favor. The Holland family brought this lawsuit against American to recover for John Holland's death, alleging American's negligence proximately caused Holland's death. American settled with the Holland family members, paying them $2,250,000. American filed a third-party action against CJ alleging CJ was liable to American under the indemnity agreement for American's payments to the Holland family in settlement of their claims and for American's attorney's fees in defending itself in this suit and in the litigation against Duke's insurer. CJ filed a counterclaim for breach of warranty against American for the cost of the gearbox.

On American's claims, the jury found CJ's defective work resulted in a loss or claim to American and that CJ, through reasonable diligence, could have discovered a matter that resulted in a loss or claim against American. The jury did not find that the loss or claim against American arose from CJ's sole negligence. The jury also found that American's negligence was a proximate cause of "the accident in question." On CJ's breach of warranty claim, the jury found American breached the warranty and that CJ's damages were $78,935.62.

CJ moved for judgment notwithstanding the verdict requesting the court to disregard the jury's answers indicating that CJ's actions led to the claim against American and that CJ could have discovered the matter that led to the claims against American. American also moved for judgment notwithstanding the verdict on the jury's finding that American's negligence proximately caused the accident. The trial court granted CJ's motion and rendered judgment that American take nothing on

its claims against CJ. The court also rendered judgment for CJ for $78,935.62 on its breach of warranty claim against American.

## CAUSATION

In its first issue, American contends there is no evidence of proximate cause to support the jury's finding that American's negligence proximately caused the accident and that the trial court erred by denying American's motion for judgment notwithstanding the verdict on American's contractual indemnity claim. In its second issue, American contends the jury's finding that American's negligence proximately caused the accident was against the great weight and preponderance of the evidence and that the trial court erred by overruling American's motion for new trial asserting factually insufficient evidence of proximate causation.

For an action to be the proximate cause of an injury, it must be both the cause in fact and the foreseeable cause of the injury. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 582 (Tex. 2007). These elements cannot be satisfied by mere conjecture, guess, or speculation. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798–99 (Tex. 2003).

In reviewing the legal sufficiency of the evidence, which also includes review of a ruling on a motion for judgment notwithstanding the verdict, we consider all the evidence before the jury, crediting evidence in support of the verdict if reasonable jurors could, and disregarding evidence contrary to the verdict unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.). If there is more than a scintilla of evidence to support the finding, the evidence is legally sufficient. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in

legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). If the evidence furnishes a reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is legally sufficient evidence, more than a scintilla, to support the fact. *Id.*

When reviewing the factual sufficiency of the evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Cameron v. Cameron*, 158 S.W.3d 680, 683 (Tex. App.—Dallas 2005, pet. denied). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 782 (Tex. App.—Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Hinkle*, 223 S.W.3d at 782.

We review the overruling of a motion for new trial for an abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). The trial court abuses its discretion only if it acted unreasonably or in an arbitrary manner, without reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 538 (Tex. App.—Dallas 2007, pet. denied).

## Foreseeability

American argues that any negligence by it in overhauling and inspecting the gearbox could not be a proximate cause of the helicopter crash because Holland and Edgerton's operation of the aircraft with the oil-pressure warning light disconnected and when they knew it would have been illuminated was not foreseeable as a matter of law. American's argument is, in effect, that Holland

and Edgerton's actions were a new and independent and superseding cause of the crash.

To determine whether an act or omission alleged to be a new and independent cause is a concurring cause or a superseding cause, the court must determine whether the second act or omission was foreseeable at the time of the first negligent act or omission. If the second act or omission was foreseeable, then the causation is concurring and the first actor remains liable. However, if the second act or omission was not foreseeable, then its causation supersedes the first instance of negligence, and the first actor has no liability for the resulting damages. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857 (Tex. 2009); *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451 (Tex. 2006) (plurality opinion); *Biaggi v. Patrizio Rest. Inc.*, 149 S.W.3d 300, 305 (Tex. App.—Dallas 2004, pet. denied). Moreover, where the risk resulting from the intervening act is the same as the risk from the original actor's negligence, the intervening act cannot be classified as a superseding cause. *Columbia*, 284 S.W.3d at 859; *Dew*, 208 S.W.3d at 453 (citing RESTATEMENT (SECOND) OF TORTS § 442B).[4]

In this case, there is conflicting evidence regarding whether American could have foreseen Edgerton's action in approving the aircraft for the flight and Holland's action in flying the aircraft when the gearbox oil-pressure warning light was disconnected and when the warning light would have been illuminated had it been connected.

Eurocopter's fault-isolation manual provides that the corrective action when only the oil-pressure warning light illuminates is (1) to check the warning light electrical circuit, (2) to replace

---

[4] Section 442B, styled "Intervening Force Causing Same Harm As That Risked By Actor's Conduct," provides,

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.

RESTATEMENT § 442B

the oil-pressure switch, and (3) if there is no electrical anomaly, to remove the gearbox for major overhaul. The parties also presented witnesses testifying to facts relevant to determining whether American could have foreseen the second flight.

William Monk, a helicopter mechanic employed by CJ, testified that the manufacturer's manuals did not allow the aircraft to be flown before these steps were completed. Monk testified that he never deviated from the manuals and that he would comply with all the maintenance and troubleshooting requirements possible before permitting anyone to fly an aircraft, even for a maintenance flight.

James Lynn, CJ's chief pilot, testified that CJ's operations manual permitted nonroutine flight operations, but only if the aircraft met a special definition of "airworthy." That definition required that the aircraft be inspected to determine that it is in a "safe" condition for flight. The word "safe" was defined in the operations manual as meaning "Not apt or able to cause or incur damage or harm, free from hazard." Lynn testified he trained pilots to perform nonroutine flight operations in safe aircraft only, and an aircraft with a failing gearbox is not safe. Lynn also testified that an aircraft on which the oil-pressure warning light illuminates could have a problem with the gearbox even if the oil-temperature warning light does not illuminate.

William Force, an expert witness for American concerning piloting helicopters, testified that Holland should not have made the second flight. The flight was a "ferry flight" to reposition the aircraft for maintenance purposes. He testified that a pilot may not fly a helicopter, even on a ferry flight, unless all the warning lights are operable and none of them are turned on. If the warning lights are not operable, then the aircraft may not be flown. Force testified that Holland violated CJ's operations manual by flying the helicopter with a warning light disabled and when the warning light would have been turned on if it had not been disabled. He testified the accident was preventable and

that it would not have occurred if Eurocopter's required procedures had been followed.

Doug Stimpson, CJ's expert witness concerning the overhaul procedures for the gearbox and the work of aircraft mechanics, testified that Holland and Edgerton's actions were appropriate under the circumstances. Stimpson testified, and Eurocopter's fault-isolation manual provided, that the warning-light system warns of low oil pressure when both the oil-pressure and oil-temperature warning lights illuminate. The manual states that possible causes of only the oil-pressure warning light illuminating are a faulty warning light or a faulty oil-pressure switch. Stimpson testified that a helicopter with a faulty warning light or a faulty oil-pressure switch is not technically airworthy for normal flight operations but is safe to fly. In that situation, he testified, it was appropriate for Holland and Edgerton to decide to make a "ferry flight" to fly the aircraft to a base where repairs and maintenance could be performed. *See* 14 CFR § 21.197(a)(1).

To perform a ferry flight, one presents an application to the Federal Aviation Administration's (FAA) local office for a special flight permit. According to Stimpson, if the form is filled out properly, the FAA issues the permit without inspection of the aircraft. Edgerton and Holland did not apply for the special flight permit before making the flight because the FAA's office was closed. However, Stimpson testified that if they had applied, they would have received the permit to fly the aircraft back to Duke, and the result would have been the same.

Keith McCutchen, CJ's expert witness on helicopter piloting, testified that ferry flights with minor problems are customary in the industry. McCutchen testified that the oil-pressure warning light illuminating would appear to a pilot to be a problem with the oil-pressure indicator and not a sign of low oil pressure. The pilot in this situation would have no reason to believe a newly overhauled gearbox was in imminent danger of failing. He stated that a ferry flight back to Duke for further maintenance in this situation was appropriate. McCutchen thought Edgerton and Holland

-10-

should have gotten a special flight permit before Holland made the ferry flight; however, he testified that "not having a ferry permit would not have caused the failure and the crash." He also stated that disconnecting the oil-pressure warning light was a good idea. The oil-temperature warning light was located immediately below the oil-pressure warning light. With the oil-pressure warning light disabled, the pilot would know immediately if the oil-temperature warning light came on. McCutchen also testified that the flight manual's rule that all warning lights must be off before flying did not apply to ferry flights because those flights are governed by the federal air regulations, which permit ferry flights.

Stimpson and McCutchen's testimony that a ferry flight in this situation would be a normal occurrence constitutes some evidence that the ferry flight in this case was foreseeable to American. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 581 (Tex. 2001) ("General industry practice or knowledge may establish a basis for foreseeability to show negligence . . . ."). The jury's implicit determination that the second flight was foreseeable was not so contrary to the evidence as to be clearly wrong and unjust; accordingly, we conclude it is supported by factually sufficient evidence.

In support of its argument that the ferry flight was unforeseeable, American relies on this Court's opinion in *Aerospatiale Helicopter Corp. v. Universal Health Services, Inc.*, 778 S.W.2d 492 (Tex. App.—Dallas 1989, writ denied), which involved a twin-engine helicopter crash. In that case, the pilot took off while the cowling for one of the engines was open. During flight, the cowling separated from the aircraft, snagged a fuel line, and cut off fuel to that engine. *Id.* at 495. The helicopter was designed to fly with only one engine, and it automatically shifted the power requirements to the second engine. *Id.* at 496. The instruments in the cockpit reflected that one engine was off line and the second engine was running at higher than normal torque and temperature.

The pilot then shut off fuel to the second engine. The helicopter crashed, killing everyone on board. *Id.* Aerospatiale, the helicopter manufacturer, asserted the cowling separation, as a matter of law, was not a proximate cause or producing cause of the crash. *Id.* at 496 We agreed with Aerospatiale. *Id.* at 497. In explaining why there was no proximate causation, we relied on authority stating,

> In applying the test of foreseeability to situations where a negligently created pre-existing condition combines with a later act of negligence causing an injury[,] there is a distinction between a situation in which one has created a dangerous condition and a later actor observes, or by the circumstances should have observed, the existence of the dangerous condition and a situation in which the dangerous condition is not apparent and cannot be observed by the actor. In regard to the first situation, the intervening act interrupts the natural sequence of the events and cuts off the legal effect of the negligence of the initial actor. This is based upon the premise that it is not reasonable to foresee or expect that one who actually becomes cognizant of a dangerous condition in ample time to avert the injury will fail to do so.

*Id.* at 497 (quoting *Wolf v. Friedman Steel Sales, Inc.*, 717 S.W.2d 669, 673 (Tex. App.—Texarkana 1986, writ ref'd n.r.e.)). We observed that all the testimony showed that if the pilot had followed the proper procedures, the accident would not have occurred. The pilot failed to follow the operator's manual's procedures for isolating a defective engine, and he had to take extraordinary steps to shut off the fuel supply to the second engine, including breaking a wire. We concluded, "the pilot's actions in this regard were not foreseeable by Aerospatiale." *Id.*

*Aerospatiale* is distinguishable because, in this case, evidence exists that "the dangerous condition is not apparent and cannot be observed by the actor." *Id.* (quoting *Wolf*, 717 S.W.2d at 673). Stimpson, McCutchen, and Armond Edwards, an aviation accident investigator, testified that Edgerton and Holland could not have known that the gearbox was facing imminent failure.

American also cites *In re Air Crash at Dallas/Fort Worth Airport*, 919 F.2d 1079 (5th Cir. 1991). That case involved a Delta Airlines flight that crashed at DFW Airport when the flight encountered downdraft windshear while attempting to land during a thunderstorm. *Id.* at 1084. The

crew members of the flight had observed the thunderstorm at the end of the runway and knew that it contained windshear, but they made the decision to land there anyway. *Id.* at 1085. The district court found the sole proximate cause of the catastrophe was the deliberate decision of the flight crew to enter a storm cell despite having observed the lightning that clearly marked it as a thunderstorm. *Id.* at 1087. The Fifth Circuit affirmed, concluding that although the flight controllers at the airport were negligent in failing to relay weather information to the aircraft, that negligence was not a proximate cause of the crash because the flight crew already knew all the weather information. "Any failure of the air traffic controllers to warn a pilot of the presence of a storm in his path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger, and decided to fly ahead into it." *Id.* at 1085 (quoting district court's opinion). The Fifth Circuit stated,

> [W]e cannot gainsay the [district] court's apparent view that when Flight 191 chose to fly into a thunderstorm at a low altitude and speed it chose to dice with death. . . . The court's finding that the crew's deliberate decision to land through a known thunderstorm located at the end of the runway, when they could easily have gone around, was the sole proximate cause of this disaster is not clearly erroneous . . . ."

*Id.* at 1087–88. That case is distinguishable from the one before us because the crew members in that case knew they were flying into a thunderstorm with windshear and appreciated the danger. In this case, the evidence supports a finding that Holland and Edgerton reasonably believed the warning light had malfunctioned and had no reason to know that the newly overhauled gearbox was about to fail.

American also cites *McLennan v. American Eurocopter Corp.*, 245 F.3d 403 (5th Cir. 2001). In that case, a helicopter crashed after running out of fuel. The pilot had ignored the low-fuel warning light, failed to make proper calculations of fuel consumption, and knowingly continued to fly without refueling after he reached the mandatory twenty-minute reserve. *Id.* at 410–14. The pilot

–13–

sued American, alleging the fuel gauge had stuck at around eighteen or eleven percent, came unstuck at about three percent when the helicopter was almost out of fuel, and that American failed to warn that the fuel gauge might be inaccurate. *Id.* at 413–14. The Fifth Circuit concluded the pilot failed to establish proximate causation because, inasmuch as he disregarded the many warnings American and the helicopter itself provided about the fuel gauge and being low on fuel, he failed to prove he would have heeded any additional warnings. *Id.* at 433–34. The court concluded the causal connection was too remote.

*McLennan* is distinguishable from the case before us. In *McLennan*, the low-fuel warning light meant the helicopter was low on fuel and there was no proof the pilot would have heeded any additional warning; while in this case, there is evidence that when only the oil-pressure warning light comes on, there is a problem with the oil-pressure switch, and the warning light does not mean there is low oil pressure. The evidence in this case also does not suggest that Holland and Edgerton would have ignored further warnings. Instead, the evidence shows they were taking further precautions to evaluate the problem.

American also argues it was not foreseeable that Holland and Edgerton "would ignore mandatory procedures in the manufacturer's troubleshooting manual, take affirmative action to bypass the warning system, a critical safety device, or contravene FAA regulations." The fault-isolation manual provides that the corrective action when only the oil-pressure warning light illuminates is (1) to check the warning light electrical circuit, (2) to replace the oil-pressure switch, and (3) if there is no electrical anomaly, to remove the gearbox for major overhaul. Edgerton complied with step (1) by disconnecting the oil pressure switch and checking that the light coming on was not caused by a short circuit, but he and Holland decided the aircraft could be flown back to Duke in a ferry flight to complete the remaining steps. Stimpson and McCutchen testified this was

an appropriate decision. Although the flight manual states the warning lights must be off before a takeoff, Stimpson and McCutchen testified that this provision did not apply to a ferry flight. The jury could conclude from the evidence that Edgerton's disabling the oil-pressure warning light did not cause the crash. This determination is not so contrary to the evidence as to be clearly wrong and unjust.

American's argument that Holland and Edgerton's decision to perform a ferry flight of the helicopter back to Duke was a superseding cause also fails because, where the risk resulting from the intervening act is the same as the risk from the original actor's negligence, the intervening act cannot be classified as a superseding cause. *Columbia*, 284 S.W.3d at 859. In this case, the risk from American's negligence was the same as the actual risk from Holland's and Edgerton's decision to fly the helicopter knowing the oil-pressure light would be illuminated if it were connected: catastrophic failure of the main rotor gearbox during flight and the resulting crash killing Holland.

## Cause in Fact

American also argues that its negligence was not a cause in fact of the crash. "Cause in fact" means the act or omission was a substantial factor in bringing about the injury and that, without it, the harm would not have occurred. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798–99 (Tex. 2003). Cause in fact is not established where the actor's negligence does no more than furnish a condition which makes the injuries possible. *Id.* In other words, the actor's conduct may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm. *Id.* American asserts its negligence furnished, at most, a condition that allowed the subsequent negligent decisions of Edgerton and Holland to result in the crash.

American first argues there was no cause in fact because the danger from American's negligence had "come to rest" before the second flight commenced. American argues,

The helicopter's *first* flight that night was dangerous, but . . . the helicopter landed safely, its occupants deplaned, and the danger passed. . . . With the helicopter on the ground, there was no danger this particular main rotor gearbox would fail during flight, and there was no danger that as a result, the helicopter would crash. Taking the *second* flight that night was inexplicable recklessness by CJ's mechanic and pilot.

However, there is evidence that Holland and Edgerton's actions in making the second flight were not "inexplicable recklessness," namely, Eurocopter's fault-isolation manual and the testimony of the expert witnesses on piloting and maintaining this type of helicopter. This evidence showed the oil-pressure warning light meant the newly overhauled gearbox had a bad oil-pressure switch, a not uncommon problem, which did not make the helicopter dangerous. Edgerton completed the fault-isolation steps as far as he was able with the equipment he had with him, and he and Holland approved flying what appeared to them to be a safe helicopter back to Duke to finish the maintenance. Evidence before the jury showed this decision was normal within the industry.

American relies on two cases in support of its argument that its negligence was not a cause in fact of the crash: *Union Pump Co. v. Allbritton*, 898 S.W.2d 773 (Tex. 1995), and *Bell v. Campbell*, 434 S.W.2d 117 (Tex. 1968). In *Union Pump*, an employee at a chemical plant assisted in extinguishing a fire at the plant caused by a defective pump. After the fire was extinguished, the employee slipped and fell in some water or firefighting foam and was injured. She sued the pump's manufacturer, asserting that but for the pump fire, she would never have slipped on the water or foam. *Union Pump*, 898 S.W.2d at 774. In *Bell*, a vehicle pulling a trailer on a highway rear-ended another vehicle. In the accident, the trailer broke off and came to rest on the highway. People stopped to help move the trailer off the highway. As they were doing so, another vehicle struck three of the people, killing two of them. *Bell*, 434 S.W.2d at 119. The people struck in the second accident sued the drivers in the first accident. *Id.* at 118. In both cases, the supreme court determined the defendants' negligence was not a proximate cause because the forces generated by

their negligence had come to rest when the plaintiffs' injuries occurred. In *Union Pump*, the fire was extinguished when the employee slipped due to the slick footing from the firefighting. In *Bell*, the vehicles and unhooked trailer had come to rest before a passing car struck the people helping to move the trailer out of the roadway. In these situations, the supreme court concluded the defendants' negligent actions (making a pump that catches fire and rear-ending another vehicle) were too remotely connected to the plaintiffs' injuries to constitute the legal causes of those injuries. *Union Pump*, 898 S.W.2d at 776; *Bell*, 434 S.W.2d at 122.

In this case, however, the "forces" generated by American's negligence had not come to rest. In *Union Pump*, all the potential injury from the fire caused by the negligently constructed pump ceased as soon as the fire was extinguished. The employee was not injured in the fire, so her injuries were not caused by the pump starting the fire. *Union Pump*, 898 S.W.2d at 776. In *Bell*, all the potential injury from the first accident ceased when the vehicles came to rest. The people were not injured in the initial accident, so their injuries were not caused by the defendants' negligence in the first accident. *Bell*, 434 S.W.2d at 122. In this case, however, the potential injury from American's negligence remained active in the form of the gearbox facing imminent failure. The danger created by American's negligence, imminent failure of the gearbox, remained active after the helicopter landed safely at Alamance.

American also asserts that cause in fact did not exist because American's negligence did no more than furnish a condition that made the injury possible—that is, it allowed Holland's and Edgerton's negligence in deciding to fly the helicopter to cause the crash. *See IHS Cedars*, 143 S.W.3d at 799. American relies on *IHS Cedars* in support of this argument. In that case, Mason was a patient at IHS Cedars mental institution where she had voluntarily admitted herself for depression. During her stay, she became friends with her roommate, Thomas. On the same day, both Mason and

Thomas requested to be released. *Id.* at 796. Mason told the nurse she planned to spend time with Thomas after her release. *Id.* at 796–97. Mason's and Thomas's physicians released them the same day without consulting with one another. The next day, Mason was riding in a car driven by Thomas when Thomas had a psychotic episode, drove at high speed, swerved to avoid a dog in the road, lost control of the car, and crashed injuring Mason. *Id.* at 797. Mason sued the doctors, the nurse, and the clinic alleging negligence in failing to provide adequate care and treatment, inappropriately deciding to discharge her, failing to adequately train physicians and staff, and failing to warn Mason of the danger posed by Thomas. *Id.* Mason argued that her uncorrected mental condition left her vulnerable to Thomas's manipulative and controlling behavior and caused Mason to be in the car with Thomas. The supreme court concluded the alleged negligence may have allowed Mason to be in the car with Thomas, but it did not cause Thomas to experience a psychotic episode, drive wildly, swerve to avoid the dog, or crash the car. *Id.* at 801–02 ("It is clear, however, that Thomas's speeding and psychotic episode and swerving the car to miss the dog in the road caused Mason's injuries, not negligent treatment or negligent discharge."). The defendants' negligence merely created the condition in which the accident occurred, but it did not cause the accident or Mason's injuries. *Id.*

*IHS Cedars* is distinguishable from the case before us because American's faulty gearbox did not merely furnish the condition that allowed the accident to occur. The faulty gearbox was the reason the helicopter crashed.

After considering all the evidence in the record, we conclude there is some evidence to support the jury's implicit finding that American's negligence was a cause in fact of the accident, and that finding is not so against the great weight and preponderance as to be clearly wrong and unjust.

–18–

## Conclusion

Having determined there is legally and factually sufficient evidence that American's negligence was the cause in fact of the helicopter crash and that the crash was a foreseeable result of that negligence, we conclude there is legally and factually sufficient evidence to support the jury's finding that American's negligence was a proximate cause of the accident. Accordingly, we conclude the trial court did not err by denying American's motion for judgment notwithstanding the verdict and by overruling American's motion for new trial on American's contractual indemnity claim. We overrule American's first and second issues.

## INDEMNITY AGREEMENT

In its third issue, American contends the trial court erred by not rendering judgment for American because the jury's answers entitled it to judgment on its cause of action for breach of the indemnity agreement.

The parties' agreement contained a provision in which CJ agreed to indemnify American against all losses, claims, and expenses including legal expenses with respect to defective work "arising from services furnished and work performed" by CJ. The agreement also provided,

> [CJ's] indemnity and hold harmless obligations specifically extend to any and all losses, damages, injuries, claims, demands and expenses, including legal expenses of any kind and nature, arising from [CJ's] sole negligence. Without limiting the foregoing, in no event shall American Eurocopter be liable for any loss, damage, injury, or claim resulting from any matter, which could have been discovered by [CJ] through the exercise of reasonable diligence in connection with the undertaking of any inspection, maintenance, and/or repair performed by [CJ].

The jury found that CJ "performed defective work that resulted in any loss, damage, injury, demand or expense to, or claim against" American, and that CJ "could have discovered through the exercise of reasonable diligence in connection with the undertaking of any inspection, maintenance, and/or repair a matter which resulted in any loss, damage or injury to, or claim against" American.

–19–

American argues that it is entitled to judgment on its indemnity claim based on these jury findings.

CJ argues that the express negligence doctrine bars American's claim for indemnity. Under that doctrine, parties seeking to indemnify themselves for their own negligence must express that intent in specific terms in the indemnity agreement. *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 814 (Tex. 1994) ("We hold that no obligation to indemnify an indemnitee for the costs or expenses resulting from a claim made against it for its own negligence arises unless the indemnification agreement complies with the express negligence test."); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987) ("The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms."). The doctrine also applies to situations where the indemnitee's negligence proximately causes injury jointly and concurrently with the indemnitor's negligence. In that situation, the indemnity provision must expressly provide for the parties' concurrent negligence. *Ethyl Corp.*, 725 S.W.2d at 708. The doctrine is not an affirmative defense; it is a rule of contract interpretation determinable as a matter of law. *Fisk*, 888 S.W.2d at 814.

All of American's "losses, damages, injuries, claims, demands and expenses, including legal expenses" arose out of the helicopter crash. The jury found American's negligence was a proximate cause of "the accident in question," i.e., the helicopter crash. The last sentence in the indemnity provision provides, "[w]ithout limiting the foregoing, in no event shall [American] be liable for any loss, damage, injury, or claim resulting from any matter, which could have been discovered by [CJ] through the exercise of reasonable diligence in connection with the undertaking of any inspection, maintenance, and/or repair performed by [CJ]." In other words, the parties appeared to contemplate that should damage result from American's negligence, but CJ could have discovered that negligence as part of its inspection, maintenance, or repair, American would not be responsible for those

losses—that is, American would not be responsible for its own negligence, and CJ would be required to indemnify American based on the jury's finding that the losses could have been discovered by CJ through the exercise of reasonable diligence in its undertakings. Applying the express negligence doctrine, we conclude the parties did not express their intent in clear, unambiguous terms within the four corners of the contract as to both indemnification for American's own negligence and application to CJ's concurrent negligence. *See Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004) (quoting *Ethyl Corp.* and stating under express negligence doctrine intent must be specifically stated within four corners of contract); *Ethyl Corp.*, 725 S.W.2d at 708 (applying express negligence doctrine to concurrent negligence).

American's argument that the express negligence doctrine does not apply because American seeks indemnification for the consequences of CJ's negligence and not for its own negligence is unpersuasive. The supreme court addressed a similar argument in *Ethyl Corp.* The dispute there originated from a worker's compensation claim. When the employee of a construction company sued the premises owner, the owner sought indemnity from the construction company. The jury in the indemnity suit apportioned responsibility for the injuries ninety percent against the owner and ten percent against the construction company. Following the jury's verdict, the trial court granted indemnity to the owner, and the court of appeals reversed the judgment based on its conclusion that the indemnity provision did not clearly and unequivocally require indemnification for the owner's own negligence or the parties' concurrent negligence. Affirming the appellate decision, the supreme court adopted the express negligence doctrine and applied it to proportionate responsibility, stating,

> Indemnitees seeking indemnity for the consequences of their own negligence which proximately causes injury jointly and concurrently with the indemnitor's negligence must also meet the express negligence test. . . . In Texas, there exists no right to indemnity on a comparative basis under the common law. . . . Parties may contract for comparative indemnity so long as they comply with the express negligence

doctrine set out herein.

*Ethyl Corp.*, 725 S.W.2d at 708–09 (citations omitted).

American also argues the express negligence doctrine is not implicated because the indemnity clause between CJ and American does not reference American's own negligence. As described above, we disagree with such characterization. The agreement between CJ and American implicates indemnification for American's negligence in the event CJ could have discovered—through the exercise of reasonable diligence in connection with its undertaking of any inspection, maintenance, or repair—the matter causing the loss. The jury found both CJ's and American's negligence were causes of the crash, which resulted in all of the losses for which American seeks indemnity. Because the indemnity provision did not express in clear, unambiguous terms that CJ was indemnifying American for its own negligence and that its indemnification applied if the loss was due to the parties' concurrent negligence, application of the express negligence doctrine bars American's claim for indemnity. *See Ethyl Corp.*, 725 S.W.3d at 708. We overrule American's third issue.

Because of our determination of American's third issue, we need not address its fourth issue.[5] The parties have informed us they have reached an agreement as to the fifth issue; accordingly, we need not address that issue.

## BREACH OF WARRANTY

In its sixth issue, American contends there is no evidence of an express warranty for which money damages is a remedy. The jury found American failed to comply with an express warranty that products overhauled by American would be free from defects in material and workmanship

---

[5] In its fourth issue, American contends the jury's determination that there was insufficient evidence to find CJ's actions were the "sole cause" of American's loss was immaterial and that CJ's being the sole cause of American's loss was established as a matter of law. Because the evidence supports the jury's verdict that American's negligence was a proximate cause of "the accident in question," and the express negligence doctrine prohibits American from recovering on its indemnity claim, this issue is not material to the final disposition of the appeal and need not be addressed. *See* TEX. R. APP. P. 47.1.

under normal use and service, and that the failure to comply with the warranty was a producing cause of damages to CJ. The jury found CJ's damages were $78,935.62, which was the amount listed on American's invoice to CJ for the gearbox. The trial court rendered judgment for CJ for that amount.

American contends there is no evidence CJ can recover damages because the express warranty contained a disclaimer of liability and a limitation of remedy. American argues (1) the agreement disclaimed any warranty if CJ failed to maintain and operate the helicopter in accordance with the manuals, or if CJ misused, abused, or neglected the helicopter or its parts; and (2) the remedy for breach of warranty was limited to repair or replacement of the warranted part.

American's warranty provided:

7. LIMITED WARRANTY

> . . . .

> > (c) Seller warrants all overhauled Products by . . . American Eurocopter Corp. to be free from defects in material and workmanship under normal use and service. Seller's obligation under this warranty is limited to replacing or repairing parts that, at the time of any repair or replacement, shall have been recognized by Seller in sole discretion of Seller, as subject to this warranty . . . .

> > . . . .

> > (e) This warranty shall apply only to the extent the helicopter and the parts installed therein are operated and maintained in accordance with the instructions contained in the Flight Manual and the Maintenance Manual.

> > . . . .

> > (g) This warranty shall not apply to any helicopter or part . . . which has been subject to misuse, common neglect, abuse, negligence or accident.

To recover for breach of an express warranty, a plaintiff must prove: (1) an express affirmation of fact or promise by the seller relating to the goods; (2) that such affirmation of fact or promise became a part of the basis of the bargain; (3) that the plaintiff relied upon said affirmation

of fact or promise; (4) that the goods failed to comply with the affirmation of fact or promise; (5) that the plaintiff was injured by such failure of the product to comply with the express warranty; and (6) that such failure was the proximate cause of the plaintiff's injury. *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 681 (Tex. App.—Austin 2002, pet. denied).

Disclaimers of warranty and limitations of remedy in a warranty are not elements of the plaintiff's cause of action; they are affirmative defenses. *See Thomas v. Omar Invs., Inc.*, 156 S.W.3d 681, 684 (Tex. App.—Dallas 2004, no pet.); *Great Am. Prods.*, 94 S.W.3d at 683. American, not CJ, had the burden to prove these affirmative defenses. *See Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 164 (Tex. 2012). A no-evidence issue is appropriate when the challenging party does not have the burden of proof; a no-evidence issue is not appropriate when the party bringing the issue has the burden of proof. *See Stauffacher v. Lone Star Mud, Inc.*, 54 S.W.3d 810, 816 (Tex. App.—Texarkana 2001, no pet.); *see also* W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 45 ST. MARY'S L.J. 3, 43 (2010). Because CJ had no burden of proof on these defenses, American's no-evidence issue lacks merit.

Furthermore, American failed to preserve error as to its argument that the warranty's limitation of repair or replacement of a defective part barred CJ's claim for damages. Nowhere in American's trial and post-trial motions did it argue that CJ's breach-of-warranty claim was precluded by the warranty's limitation of remedy. Instead, American argued in those motions concerning the breach of warranty that (1) the evidence supporting the jury's findings on breach of warranty was legally and factually insufficient; (2) CJ did not own the gearbox; (3) American did not sell or lease the gearbox to CJ; (4) CJ suffered no harm from the destruction of the gearbox; (5) CJ lacked standing to bring the breach of warranty claim because it did not own the gearbox; (6) CJ had no evidence American breached the warranty; (7) CJ had no evidence it was damaged by any breach

of warranty; (8) CJ's claim was barred because CJ breached the warranty's requirement that CJ inspect and maintain the helicopter in accordance with the manufacturer's requirements and not misuse, abuse, or neglect the parts; (9) collateral estoppel from Duke's suit in North Carolina barred CJ's claim; and (10) the jury question on breach of warranty contained the wrong standard of causation.

"The cardinal rule for preserving error is that an objection must be clear enough to give the trial court an opportunity to correct it." *Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 387 (Tex. 2008). However, post-trial objections need not be as specific and detailed as an appellate brief. *Id.* at 388. Although American pleaded the defense of limitation of remedy, it never mentioned it during the trial or in any of the motions presented during or after the trial. In this case, nothing in the motions could have alerted the trial court to the complaint that the limitation of remedy in the warranty barred CJ's claim, and nothing in the record indicates the trial court was aware of this complaint. *Cf. id.* (argument on appeal preserved because trial court was aware of argument even though post-trial objection was not specific). We conclude American did not preserve this complaint for appellate review.

We overrule American's sixth issue.

## CONCLUSION

We affirm the trial court's judgment.

_____
LANA MYERS
JUSTICE

100342HF.P05

-25-



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

AMERICAN EUROCOPTER CORPORATION, Appellant

No. 05-10-00342-CV     V.

CJ SYSTEMS AVIATION GROUP, Appellee

Appeal from the 298th District Court of Dallas County, Texas. (Tr.Ct.No. 02-03974-M).

Opinion delivered by Justice Myers, Justices Murphy and Fillmore participating.

This Court's judgment of July 18, 2012 is **VACATED**; the following is now the judgment of this Court:

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. It is **ORDERED** that appellee CJ Systems Aviation Group recover its costs of this appeal and the full amount of the trial court's judgment from appellant American Eurocopter Corporation and Travelers Casualty and Surety Company of America as surety on appellant's supersedeas bond.

Judgment entered March 8, 2013.

_____

LANA MYERS

JUSTICE