# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

NO. 03-21-00325-CV

---

**J. B., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 317,553-B, THE HONORABLE DALLAS SIMS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

J.B. (Mother) appeals from the trial court's decree terminating her parental rights to her daughter, "Jade," finding that termination is in Jade's best interest and that Mother had knowingly placed Jade and allowed her to remain in conditions that endangered her well-being, engaged in conduct and placed her with others who engaged in conduct that endangered her well-being, constructively abandoned her, and failed to comply with a court order establishing the actions necessary to regain custody.[1] *See* Tex. Fam. Code § 161.001(a)(1)(D), (E), (N), (O), (2). We affirm the trial court's order of termination.

---

[1] For the child's privacy, we refer to her by a pseudonym. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. Father's rights were also terminated but he is not a party to this appeal: he never responded after being served, and Mother told the Department "that he did not want anything to do with the case and that we are not allowed to contact him."

## SUMMARY OF THE EVIDENCE

Jade was born May 21, 2020. The Department received a referral after Mother tested positive in the hospital for cocaine and amphetamine and Jade showed signs of exposure to illegal drugs. Mother was arrested in mid-January 2021 and remained incarcerated at the time of the final hearing on June 8, 2021.[2] At the final hearing, the trial court heard testimony by Mother and Department caseworker Jacqueline Sanders; Jade's guardian ad litem provided her recommendation; and the Department introduced into evidence its removal affidavit, Mother's psychological evaluation, a report by Mother's counselor, and the Department's final report.

The May 22, 2020 removal affidavit alleged that Mother had tested positive for cocaine and amphetamine when Jade was born. The Department had not yet received test results for Jade's meconium, but she was "showing signs that could be caused from being exposed to illegal drugs": she was not breathing well, had low oxygen levels, was not feeding well, had nasal congestion, and was exhibiting "nasal flaring which means she is trying harder to breath[e]." Mother admitted using cocaine a week before Jade's birth because she was stressed and "fearful that family members would come to take her new baby." She denied using amphetamines, reported a history of drug use in another state within six months of the child's birth, and admitted that her five older children had been removed from her care in Michigan but denied that their removal was related to drug use. In addition, Mother had been diagnosed with schizophrenia and was not taking medication or undergoing therapy at the time.

Mother completed her psychological evaluation in September 2020, telling the psychologist that she was not sure why she had been referred for an evaluation. The evaluation

---

[2] The trial was held via video conference due to COVID-19 restrictions. *See* Supreme Court of Texas's Second Emergency Order Regarding the COVID-19 State of Disaster (Misc. Docket No. 20-9043) and all subsequent Orders.

stated that Mother reported that she drank "a lot" when her older children were removed seven years earlier after her "seven-year-old caught the house on fire"; that she used cocaine daily until about six years ago; that she never used methamphetamine but that "they said there was meth in my cocaine"; and that she did not believe that Jade had drugs in her system at birth. Mother further reported that she was diagnosed with schizophrenia when she was nineteen, had received social security ever since, and was not employed. She had taken psychotropic medication starting two years earlier, including Seroquel for schizophrenia and Trazadone for depression, but told the psychologist that she had not taken those medications for about a year and was not taking any medication at the time of the evaluation. Mother described having auditory and visual hallucinations such as "visions of the future," shadows, and "sometimes good spirits and good voices; used to be dark shadows and voices." Mother also reported that she was arrested when she was twenty-one after she stabbed her ex-boyfriend in the eye. The report concluded that Mother has a severe "overall level of disability" and diagnosed her as having post-traumatic stress disorder with dissociative symptoms; schizotypal personality disorder; severe cocaine use disorder; persistent depressive disorder; and borderline intellectual functioning. Her prognosis is "guarded to poor" because of "the range and severity of her current symptomatology." The report recommends "a psychiatric evaluation in order to determine the need for psychotropic medication," along with ongoing individual therapy, a protective parenting class, and close monitoring if the child was returned to her care.

Notes from her therapist state that she had been regular in her attendance but did not provide a "logical explanation about her on-going drug test results. [Mother] continued to say that her drug tests numbers were going down. They were and are not. They are actually going higher." The therapist reported that Mother's decision-making skills were "[n]ot good at

3

all" and that she had a high level of depression and anxiety and concluded, "This therapist can not make a positive recommendation for a monitored return due to her on-going drug use."

Mother's family service plan required her to abstain from criminal behavior, abstain from illegal drug use, submit to random weekly drug testing, complete a drug and alcohol assessment and follow all recommendations, participate in supervised visitation, complete a psychological evaluation and follow all recommendations, and attend individual counseling. The Department's final March 16, 2021 report states that Mother had not complied with many of the service plan's requirements. Mother had been arrested in late October 2020 for possession of a controlled substance and in mid-January 2021 for aggravated assault with a deadly weapon; she remained incarcerated from January through the final hearing. Between May 2020 and her arrest in January 2021, Mother took eighteen urine or oral swab drug tests, and all were positive for amphetamine and methamphetamine—in those tests, she also tested positive for cocaine seven times and positive for PCP seven times. Mother missed twenty-six tests, and two hair follicle tests were positive for amphetamine, methamphetamine, and cocaine. In September 2020, Mother completed a drug and alcohol assessment, which determined that she met the criteria for outpatient treatment, but she was asked to retake the assessment and had not done so. Further, Mother had "displayed erratic and aggressive behavior" to various service providers and to staff at her apartment complex.

The Department's report said that Jade "appears traumatized from the previous visitations with her mother to the point [Jade] screams and becomes inconsolable when seeing her mother on a virtual call." As for her foster placement, Jade "is a very happy baby who has bonded [with her] caregivers." She is happy, well-adjusted, on a steady sleeping and eating schedule, and "appears most happy when [her caregivers] are holding her." A "hole in her heart

4

from the Amphetamines in her system at the time of birth has healed," and her pediatrician said she would not need surgery to fix it.

The Department also introduced into evidence the results of three drug tests taken in December 2020. On December 11, Mother tested positive for amphetamine and methamphetamine, both with levels ">10000" ng/ml and for PCP at a level of 1041 ng/ml.[3] On December 17, she tested positive for amphetamine at 27418 ng/ml, methamphetamine at 50979 ng/ml, and PCP at 357 ng/ml. And on December 22, she tested positive for amphetamine and methamphetamine at levels of 1640 ng/ml and 4949 ng/ml, respectively.

Sanders testified that she had been the family's conservatorship worker since June 2020. She explained that the Department removed Jade from Mother's care while they were still in the hospital because Mother tested positive for methamphetamine and cocaine on a hospital drug screen and Jade was "struggling from having illegal substances in her system." Sanders testified similarly to the allegations in the removal affidavit, saying that Jade struggled to breath, "showing that she needed extra effort to breathe," and had "extremely low" blood oxygen levels. Sanders was asked whether Jade's meconium tested positive for amphetamine, methamphetamine, and cocaine, and Sanders answered, "Yes, sir."

Sanders testified about Mother's family service plan and explained that she went over the plan with Mother, who "demonstrate[d] that she understood what she needed to do" and told Sanders that "she's been given prior services in other cases she's had out of state and understood the process." Mother had "participated in some" of the required services: She did the psychological evaluation, started counseling "around August" and was fairly consistent in her

---

[3] The "MS confirm test level" for both amphetamine and methamphetamine is 500 ng/ml and for PCP is 25 ng/ml.

attendance, and took "sporadic" drug tests, although those test results were positive. Sanders said she tried to encourage Mother to work her services even though Mother "didn't meet expectations of things like confirming [visitations] or any other expectations and stipulations." Since Mother's arrest in January, Sanders had not been able to contact her because Sanders was not allowed to visit Mother in jail and, although Sanders tried to call, "Twice they were able to put me through, but she denied answering the phone call."

According to Sanders, Mother's psychological evaluation raised "several concerns, mainly mom not wanting to take accountability, and also the psychological stating that she's very paranoid, which also makes her resistant to aid or caring for her children." Sanders noted that the evaluation recommended that Mother undergo a psychiatric evaluation "to determine the need for psychotropic medication," and she believed that Mother's paranoia played a part in the issues she had with Sanders. Sanders testified that Mother's visitation with Jade "was sporadic due to either canceled or missed visits, positive testing on oral swabs or not testing." In addition, several visits were terminated early due to Mother's conduct, "and at one point we even had to call Temple Police Department because she was swinging the baby around and refused to return the baby to the Department when the visit was terminated."

Sanders testified that Mother's drug use "was consistent in that it was constantly positive. Levels did increase significantly as well as the variety of drugs used." Mother's last three tests, taken in December 2020, were positive for methamphetamine and amphetamine, but Mother "always denied her drug use and accused the Department and the testing center of faking her tests." Sanders stated that Mother had never been able to show that she could provide for Jade's needs, and she did not believe there was anything more the Department could have done to help Mother meet her service plan requirements.

Jade had been placed in one foster home immediately after her release from the hospital. In March 2021, she was moved to a second placement—a legal risk home, where she was living at the time of trial. Sanders testified that although Jade initially "struggled to warm up to" Sanders because she "associated [Sanders] a lot with mom due to visitation," since being moved into her current placement, whenever Sanders sees her, "she has warmed up to me. She even wanted a hug from me, which was just surprising and just welcoming to see how her personality has grown and how she's been able to overcome any trauma." Jade's current foster family wants to adopt her, and Sanders testified that "[t]here's no doubt" that Jade is "in her permanent home" and that termination and adoption by that family is in Jade's best interest.

Mother testified that she was in jail on charges of aggravated assault with a deadly weapon and possession of a controlled substance and said that "right now they don't have any evidence, so I'm basically just sitting in here." Mother had a court date set for July 1, 2021, and her attorney had said "either I'm getting time served or they're going to drop my charge down so that I could get a bond reduction." Mother testified that she had in-person visitation with Jade in December, that her last visit was on December 23, and that in that visit, she brought Jade a Christmas gift. Mother had not tried to contact the Department while in police custody because she did not have an address for anyone and said that she asked her mother to contact Sanders but that her mother got no answer. Mother testified that she still had her apartment, that her fiancé pays her rent, and that when she is released, she was willing to take drug tests and work services. Mother said she and her fiancé had been together for six months and that he did not have a criminal history and was not a "known drug dealer." Mother testified that Jade's father knows that he is her father and that she is in Department custody but said, "He don't care. He was the reason why I started drugs, so I removed myself from him."

7

Mother explained that she receives social security payments because she has been diagnosed with schizophrenia. At the time of the final hearing, Mother was taking medication for that condition, which she started after her January arrest. She had not taken medication before then because, "I didn't find no doctors yet. I didn't never find a doctor." Asked about her December drug tests, Mother denied that she had been using methamphetamine, testifying, "I had got myself clean. I had gotten into a program." She also denied taking three tests in December and insisted she had only tested once that month, saying, "I was gone for the whole month of December because my daughter came up missing."

The child's guardian ad litem testified that she agreed with the Department that the parents' rights should be terminated. She said Jade's first foster home had been good, "but this home that she's in now is an excellent foster home." The guardian ad litem testified:

> I don't think I've ever seen her so happy as my last visit with her. She's got everything a little girl could ask for. She's in a stable environment where there's not drug use, there's not criminal activity going on. She's safe and thriving. And that couple, they do want—their desire is to adopt [Jade]. The mom has had a year to rectify her circumstances and in that time there's been continued drug use and continued criminal activity, and that's just not an appropriate environment for a young child, or any child. So it's—I feel like it's in her best interest for her rights to be terminated to free her up for adoption.

The trial court found by clear and convincing evidence that termination was in Jade's best interest and that Mother had placed Jade in conditions that endangered her well-being, engaged in conduct that endangered her well-being, constructively abandoned her, and failed to comply with a court order establishing the actions necessary to regain custody. *See* Tex. Fam. Code § 161.001(a)(1)(D), (E), (N), (O), (2).

## STANDARD OF REVIEW

To terminate a parent's rights to her child, the Department must prove by clear and convincing evidence that the parent engaged in conduct that amounts to at least one statutory ground for termination under section 161.001 and that termination is in the child's best interest. *Id.* § 161.001(b); *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *A.C.*, 560 S.W.3d at 630. In reviewing legal sufficiency, we view the evidence in the light most favorable to the factfinder's determination, including undisputed contrary evidence, and assume the factfinder resolved disputed facts in favor of its finding. *Id.* at 630-31. If the factfinder could have formed a firm belief or conviction that the finding was true, the evidence is legally sufficient. *Id.* at 631. In reviewing factual sufficiency, we weigh the disputed evidence contrary to the finding against all the evidence favoring the finding and ask whether the disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We defer to the decisions of the factfinder, which, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

**DISCUSSION**

Mother argues that the evidence is legally and factually insufficient to support the trial court's findings of statutory grounds or of best interest. We first consider the evidence supporting the court's finding under subsection (E). *See N.G.*, 577 S.W.3d at 237. Mother argues that "the evidence establishes a single pre-removal act (testing positive for cocaine)," a single act that she asserts is insufficient to justify termination, and that "there is no evidence of any postremoval course of conduct that endangered the Child." Mother acknowledges that her conduct at some of her visitations might have been "bizarre and unusual" but argues that it did not endanger Jade. She also asserts that it would be "misguided and unfair" to determine that Mother's untreated mental illness endangered the child, contending that the Department knew she needed help controlling her mental illness "and had the means to help her do so, but it chose not to."

Termination may be ordered under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "[T]he relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions or failures to act." *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied) (quoting *Asjes v. Texas Dep't of Protective & Regul. Servs.*, 142 S.W.3d 363, 370 (Tex. App.—El Paso 2004, no pet.)). "Endangerment does not need to be established as an independent proposition but may be inferred from parental misconduct," meaning the Department does not have to prove that the parent's misconduct was directed at the child or that the child suffered an actual injury. *Id.*

10

(citing *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)); *see In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Termination under subsection (E) requires more than a single act or omission, and the Department must show a voluntary, deliberate, and conscious course of conduct by the parent, considering her actions both before and after the child was removed from the home. *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 405 (Tex. App.—Austin 2020, no pet.); *see D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00323-CV, 2020 WL 7395924, at *4 (Tex. App.—Austin Dec. 17, 2020, pet. denied) (mem. op.) (in considering endangerment under subsection (E), factfinder "may consider conduct that occurred both before and after the Department removed the children from the parent's custody"); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("courts may consider conduct both before and after the Department removed the child from the home").

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re J.O.A.*, 283 S.W.3d 336, 336 (Tex. 2009). Thus, "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *Id.* at 345. This is because illegal drug use exposes children to the possibility that their parents could be impaired or imprisoned, which would endanger the children's physical and emotional well-being. *See A.C.*, 577 S.W.3d at 699. And when the record contains evidence of a parent's drug use "'during the pendency of a termination suit, when he knows he is at risk of losing his children,' such evidence has been found legally sufficient to support a finding of endangerment under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (quoting *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.)); *see In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011,

pet. denied) (stability and permanence are of paramount importance in termination case, and parent's decision to use drugs during pendency of termination proceeding, when parent is at risk of losing child, supports a finding that parent engaged in conduct that endangered child's well-being); *Cervantes-Peterson v. Texas Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (in finding sufficient evidence of endangerment, appellate court noted that mother's drug use continued after child's removal, "in the face of periodic narcotics tests that placed her relationship with her child in jeopardy").

In this case, Mother tested positive for illegal drugs when Jade was born, admitting to using cocaine the week before; Jade showed signs of drug exposure; and Sanders agreed when asked during her testimony whether Jade's meconium test was positive for amphetamine, methamphetamine, and cocaine.[4] Although she denied ongoing drug use, asserting that the Department was faking her drug test results, Mother took and failed a total of eighteen drug tests throughout the proceeding, testing positive for methamphetamine each time and sometimes also testing positive for cocaine and PCP. She also missed testing more than

---

[4] Mother notes that Jade's meconium test results were not introduced into evidence and asserts that Sanders' affirmative answer about those test results, given in response to a "leading question," "is conclusory and no evidence at all." However, the case she cites, *In re L.C.L.*, addressed a caseworker's assertion that "testing positive for drugs is endangering children" and stated that the "conclusory statement was the *only* support for the allegation that Mother's drug use endangered her children." 599 S.W.3d 79, 84 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). In this case, Sanders was asked a specific question—whether Jade's meconium tested positive for cocaine, methamphetamine, and amphetamine—and answered that it did. She did not assert an opinion without explanation or support. *See Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389 (Tex. 2008) (explaining that conclusory testimony is that which "simply state[s] a conclusion without any explanation" or asks factfinder to "take my word for it," and citing Black's Law Dictionary 308 (8th ed. 2004), as defining "conclusory" as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). Certainly, it would be preferable for the Department to introduce such test results into evidence, but Sanders gave a direct, affirmative answer to a question of fact. Further, those testified-to test results are in line with the hospital staff's observations that Jade showed signs of drug exposure at birth.

twenty times, and the trial court could have presumed that Mother would have tested positive in those tests. *See In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied) ("A factfinder may reasonably infer from a parent's refusal to take a drug test that the parent was using drugs."); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) (same).

"A mother's drug use during pregnancy is conduct which endangers the physical and emotional well-being of the child." *Cox v. Texas Dep't of Protective & Regul. Servs.*, No. 03-99-00808-CV, 2000 WL 1471787, at *8 (Tex. App.—Austin Oct. 5, 2000, no pet.) (not designated for publication). (citing *In re W.A.B.*, 979 S.W.2d 804, 806 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)); *see also In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.) (mother's use of illegal drugs during pregnancy "may constitute conduct that endangers the physical and emotional well-being of a child," and evidence that parent continued to use illegal drugs when she knew parental rights were in jeopardy "is conduct showing a voluntary, deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being"). And her conduct—ongoing drug use, criminal activity, and neglecting her mental health—after Jade was removed can be considered when we examine evidence of an endangering course of conduct. *See D.J.*, 2020 WL 7395924, at *4; *S.R.*, 452 S.W.3d at 360. Thus, the fact that Jade was in the Department's care while Mother continued to abuse methamphetamine and other illegal drugs can be considered as evidence of endangerment.

Although Mother asserts that the Department should have helped her find assistance to combat her mental-health concerns, she had been diagnosed with schizophrenia when she was nineteen, about a decade before Jade was born. Mother knew she had been diagnosed with depression and schizophrenia and had taken medication for about a year before stopping her medications about eighteen months before trial. She said she had not yet found a

13

doctor to prescribe her medication but did not indicate that she needed or sought help in finding a doctor or that the Department had refused any requests for such help. Mother did not follow the recommendation made in her psychological evaluation to obtain a psychiatric evaluation to evaluate her need for psychotropic medications. And finally, Sanders said that Mother's paranoia, noted in her psychological evaluation and her therapist's notes, interfered with her ability to work with Sanders. The trial court could have considered Mother's mental illness, the severity of her symptoms, its effects on her behavior, and her failure to take steps to address it as some evidence of endangerment. *See S.R.*, 452 S.W.3d at 363-64 ("Mental illness alone is not grounds for terminating the parent-child relationship," but "[u]ntreated mental illness can expose a child to endangerment, however, and is a factor the court may consider.").

In addition, Mother's behavior during her visitations with Jade was, as she acknowledges in her brief, sometimes "bizarre and unusual"—at least once, a visit had to be ended early because of her conduct, and another time, the police were called because Mother swung the baby around and refused to return her at the conclusion of the visit. Mother was arrested twice during the proceeding; had been incarcerated since January; and was not likely to be released until at least July 2021. *See In re R.A.G.*, 545 S.W.3d 645, 651 (Tex. App.—El Paso 2017, no pet.) (parent's criminal conduct may support termination under subsection (E) because it exposes child to possibility that parent may be imprisoned); *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (same).

The evidence is legally and factually sufficient to show that Mother engaged in an endangering course of conduct. We thus affirm the trial court's finding under subsection (E).

*Best interest*

We review a trial court's finding of best interest in light of the factors set out in *Holley v. Adams*: the child's wishes, if appropriate given the child's age; her emotional and physical needs now and in the future; present and future emotional or physical danger posed to the child; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the child's best interest; plans for the child's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

Jade was too young to express her wishes, but Sanders testified, and the Department documents show, that the child has bonded well to her caregivers, who are providing a safe, stable home and hope to adopt her. Sanders noted how much happier and at ease Jade seems since moving to her current placement. Jade has never lived with Mother, and the Department reported that Jade seemed traumatized by visitations, screaming and becoming "inconsolable when seeing her mother on a virtual call." Despite being born with illegal drugs in her system, the child does not appear to have special needs other than the hole in her heart, which the Department reported was related to in-utero drug exposure and which was healing on its own without the need for surgical intervention. Mother has struggled with mental illness since she was nineteen but had not found a doctor to help her with medication. Although Mother engaged

15

in therapy for several months until she was arrested, her therapist could not recommend a monitored return due to Mother's ongoing drug use and expressed concerns about Mother's insistence that her drug test levels were going down when they were in fact increasing. Mother tested positive for methamphetamine, cocaine, and PCP repeatedly throughout the pendency of the case, never passing a drug test, while denying ongoing drug use. She had been arrested about three months before the hearing and remained incarcerated, expecting to be released in July. Sanders did not believe there was anything more the Department could do for Mother, and she and Jade's guardian ad litem both testified that termination of Mother's parental rights and adoption by her foster family was in the child's best interest. The evidence is both legally and factually sufficient to support the trial court's determination that termination of Mother's parental rights is in Jade's best interest.

## CONCLUSION

Having determined that the evidence is legally and factually sufficient to support the trial court's findings (1) of grounds under subsection (E)[5] and (2) that termination of Mother's rights is in the child's best interest, we affirm the court's decree of termination.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed: November 17, 2021

---

[5] Because we have found sufficient evidence supporting the subsection (E) ground for termination, we need not consider the findings of other grounds. *See Spurck v. Texas Dep't of Fam. & Protective Servs.*, 396 S.W.3d 205, 222 (Tex. App.—Austin 2013, no pet.).